[Crim. No. 5670. In Bank. Apr. 27, 1955.]

THE PEOPLE, Respondent, v. CHARLES H. CAHAN,
Appellant.

Russell E. Parsons for Appellant.

John G. Buresh, Richard V. Bettini, Morris Lavine, Horace Appel, Albert C. Garber, A. L. Wirin, Nathan L. Schoichet and Morris M. Grupp as Amici Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, Elizabeth Miller and Arlo E. Smith, Deputy Attorneys General, for Respondent.

Roger Arnebergh, City Attorney (Los Angeles), William H. Parker, Chief of Police (Los Angeles), Bourke Jones, James A. Doherty and Alan G. Campbell, Assistant City Attorneys, Ralph Eubank, Deputy City Attorney, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and

Arthur L. Alarcon, Deputy District Attorneys, J. F. Coakley, District Attorney (Alameda), R. Robert Hunter, Chief Assistant District Attorney, Maury Engel, Bernard M. King and John C. Baldwin, Deputy District Attorneys, and Bruce A. Werlhof, District Attorney (Tehama), as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—Defendant and 15 other persons were charged with conspiring to engage in horse-race bookmaking and related offenses in violation of section 337a of the Penal Code. Six of the defendants pleaded guilty. After a trial without a jury, the court found one defendant not guilty and each of the other defendants guilty as charged. Charles H. Cahan, one of the defendants found guilty, was granted probation for a period of five years on the condition that he spend the first 90 days of his probationary period in the county jail and pay a $2,000 fine. He appeals from the order granting him probation and the order denying his motion for a new trial.

Most of the incriminatory evidence introduced at the trial was obtained by officers of the Los Angeles Police Department in flagrant violation of the United States Constitution (4th and 14th Amendments), the California Constitution (art. I, § 19), and state and federal statutes. (Pen. Code, §§ 146, 602; 18 U.S.C.A. §§ 241, 242; 42 U.S.C.A. § 1983.) Gerald Wooters, an officer attached to the intelligence unit of that department testified that after securing the permission of the chief of police to make microphone installations* at two places occupied by defendants, he, Sergeant Keeler, and Officer Phillips one night at about 8:45 entered one "house through the side window of the first floor," and that he "directed the officers to place a listening device under a chest of drawers." Another officer made recordings and transcriptions of the conversations that came over wires from the listening device to receiving equipment installed in a nearby garage. About a month later, at Officer Wooters' direction,

---

*Section 653h of the Penal Code provides: "Any person who, without consent of the owner, lessee, or occupant, installs or attempts to install or use a dictograph in any house, room, apartment, tenement, office, shop, warehouse, store, mill, barn, stable, or other building, tent, vessel, railroad car, vehicle, mine or any underground portion thereof, is guilty of a misdemeanor; provided, that nothing herein shall prevent the use and installation of dictographs by a regular salaried police officer expressly authorized thereto by the head of his office or department or by a district attorney when such use and installation are necessary in the performance of their duties in detecting crime and in the apprehension of criminals."

a similar device was surreptitiously installed in another house and receiving equipment was also set up in a nearby garage. Such methods of getting evidence have been caustically censured by the United States Supreme Court: "That officers of the law would break and enter a home, secrete such a device, even in a bedroom, and listen to the conversations of the occupants for over a month would be almost incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately and persistently violate the fundamental principle declared by the Fourth Amendment. . . ." (*Irvine* v. *California*, 347 U.S. 128, 132 [74 S.Ct. 381, 98 L.Ed. 561].) ▮ Section 653h of the Penal Code does not and could not authorize violations of the Constitution, and the proviso under which the officers purported to act at most prevents their conduct from constituting a violation of that section itself.

The evidence obtained from the microphones was not the only unconstitutionally obtained evidence introduced at the trial over defendants' objection. In addition there was a mass of evidence obtained by numerous forcible entries and seizures without search warrants.

The forcible entries and seizures were candidly admitted by the various officers. For example, Officer Fosnocht identified the evidence that he seized, and testified as to his means of entry: ". . . and how did you gain entrance to the particular place? I forced entry through the front door and Officer Farquarson through the rear door. You say you forced the front door? . . . Yes. And how? I kicked it open with my foot. . . ." Officer Schlocker testified that he entered the place where he seized evidence "through a window located I believe it was west of the front door. . . . [W]hen you tried to force entry in other words, you tried to knock it [the door] down is that right? We tried to knock it down, yes, sir. What with? A shoe, foot. Kick it? Tried to kick it in, yes. And then you moved over and broke the window to gain entrance, is that right? We did." Officer Scherrer testified that he gained entry into one of the places where he seized evidence by kicking the front door in. He also entered another place, accompanied by Officers Hilton and Horral, by breaking through a window. Officer Harris "just walked up and kicked the door in" to gain entry to the place assigned to him.

Thus, without fear of criminal punishment or other discipline, law enforcement officers, sworn to support the

438

Constitution of the United States and the Constitution of California, frankly admit their deliberate, flagrant acts in violation of both Constitutions and the laws enacted thereunder. It is clearly apparent from their testimony that they casually regard such acts as nothing more than the performance of their ordinary duties for which the city employs and pays them.

 The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.". Although this amendment, like each of the other provisions of the original Bill of Rights, applies only to the federal government (*Barron* v. *Baltimore,* 7 Pet. (U.S.) 243 [8 L.Ed. 672]; *Adamson* v. *California,* 332 U.S. 46, 51 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]), '[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' [*Palko* v. *Connecticut,* 302 U.S. 319, 324-325 (58 S.Ct. 149, 82 L.Ed. 288)] and as such enforceable against the States through the Due Process Clause [of the Fourteenth Amendment.]" (*Wolf* v. *Colorado,* 338 U.S. 25, 27-28 [69 S.Ct. 1359, 93 L.Ed. 1782].) An essentially identical guarantee of personal privacy is set forth in article I, section 19 of the California Constitution.

 Thus both the United States Constitution and the California Constitution make it emphatically clear that important as efficient law enforcement may be, it is more important that the right of privacy guaranteed by these constitutional provisions be respected. Since in *no* case shall the right of the people to be secure against unreasonable searches and seizures be violated, the contention that unreasonable searches and seizures are justified by the necessity of bringing criminals to justice cannot be accepted. It was rejected when the constitutional provisions were adopted and the choice was made that all the people, guilty and innocent alike, should be secure from unreasonable police intrusions, even though some criminals should escape.*

---

*"Of course, this like each of our constitutional guarantees often may afford a shelter for criminals. But the forefathers thought this was not

 Moreover, the constitutional provisions make no distinction between the guilty and the innocent, and it would be manifestly impossible to protect the rights of the innocent if the police were permitted to justify unreasonable searches and seizures on the ground that they assumed their victims were criminals. Thus, when consideration is directed to the question of the admissibility of evidence obtained in violation of the constitutional provisions, it bears emphasis that the court is not concerned solely with the rights of the defendant before it, however guilty he may appear, but with the constitutional right of all of the people to be secure in their homes, persons, and effects.

The constitutional provisions themselves do not expressly answer the question whether evidence obtained in violation thereof is admissible in criminal actions. Neither Congress nor the Legislature has given an answer, and the courts of the country are divided on the question. The federal courts and those of some of the states* exclude such evidence. (*Weeks* v. *United States,* 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834]; *McDonald* v. *United States,* 335 U.S. 451 [69 S.Ct. 191, 93 L.Ed. 153]; see state cases collected in Appendix to *Wolf* v. *Colorado, supra,* 338 U.S. 25, 33-39.) In accord with the traditional common-law rule (see McCormick on Evidence, p, 296), the courts of a majority of the states admit it (see cases collected in Appendix to *Wolf* v. *Colorado, supra,* 338 U.S. 25, 33-39), and heretofore the courts of this state have admitted it. (*People* v. *Le Doux,* 155 Cal. 535, 547 [102 P. 517]; *People* v. *Mayen,* 188 Cal. 237, 242-253 [205 P. 435, 24 A.L.R. 1383]; *People* v. *Gonzales,* 20 Cal.2d 165, 169 [124 P.2d 44]; *People* v. *Kelley,* 22 Cal.2d 169, 172 [137 P.2d 1].)

 The decision of the United States Supreme Court in *Wolf* v. *Colorado* that the guarantee of the Fourth Amendment

---

too great a price to pay for that decent privacy of home, papers, and effects which is indispensable to the individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught.'' (Jackson, J., dissenting in *Harris* v. *United States,* 331 U.S. 145, 197, 198 [67 S.Ct. 1098, 91 L.Ed 1399]; see also *United States* v. *Di Re,* 332 U.S. 581, 595 [68 S.Ct. 222, 92 L.Ed 210].)

*Legislation has recently been enacted in Texas (Acts 1953, 53d Leg., p. 669, ch. 253, § 1; Code Crim. Proc. 727a), North Carolina (Stats. 1951, ch. 644, § 1; Gen. Stats. §§ 15-27) and Maryland (Stats. 1947, ch. 752, p. 1849; Stats. 1951, chs. 145, 704, 710; Stats. 1952, ch. 59; Md. Ann. Code, §§ 5, 5A (limited to misdemeanor cases)), prohibiting the use of illegally obtained evidence.

applies to the states through the Fourteenth does not require states like California that have heretofore admitted illegally seized evidence to exclude it now. | The exclusionary rule is not "an essential ingredient" of the right of privacy guaranteed by the Fourth Amendment, but simply a means of enforcing that right, which the states can accept or reject: "Granting that in practice the exclusion of evidence may be *an* effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which *if* consistently enforced *would be* equally effective." (Italics added. *Wolf* v. *Colorado, supra,* 338 U.S. 25 at p. 31.) The court did not state that the other methods of deterring unreasonable searches and seizures must be "consistently enforced" and be "equally effective." Except in extreme cases (see *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]), it is apparently willing to leave the matter of deterring unreasonable searches and seizures by state officers entirely to the states and is not yet ready to condemn methods other than the exclusion of the evidence as falling below "minimal standards" even though the state makes no effort whatever to enforce them and in practical effect, therefore, has no method of making this basic constitutional guarantee effective. It would appear, therefore, that despite earlier statements of the United States Supreme Court that the Fourth or the Fifth Amendment barred the use of evidence obtained through an illegal search and seizure (*Gouled* v. *United States,* 255 U.S. 298, 311-313 [41 S.Ct. 261, 65 L.Ed. 647]; *Amos* v. *United States,* 255 U.S. 313, 315-316 [41 S.Ct. 266, 65 L.Ed. 654]; *Weeks* v. *United States,* 232 U.S. 383, 391-392 [34 S.Ct. 341, 58 L.Ed. 652]), "the federal exclusionary rule," in the words of Mr. Justice Black, "is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate." (Concurring opinion in *Wolf* v. *Colorado, supra,* 338 U.S. 25, at 39-40; see also *Irvine* v. *California,* 347 U.S. 128, 135 [74 S.Ct. 381, 98 L.Ed. 561].) It would seem that it is also a rule that Congress could make binding on the states to deter state invasions of the Fourth Amendment's guarantee, which is now recognized as limiting state as well as federal action. (Cf., Civil Rights Act, Rev. Stats. § 1979, 42 U.S.C.A. § 1983; 18 U.S.C.A. §§ 241, 242; *Williams* v. *United States,* 341 U.S. 97 [71 S.Ct. 576, 95 L.Ed. 774]; *Screws* v. *United States,* 325 U.S. 91

[65 S.Ct. 1031, 89 L.Ed. 1495]; see also *Stefanelli* v. *Minard,* 342 U.S. 117, 120-121 [72 S.Ct. 118, 96 L.Ed. 138].)

The rule of the Wolf case that the Fourteenth Amendment does not require the exclusion of evidence obtained by an unreasonable search and seizure was reaffirmed recently in *Irvine* v. *California,* 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561]. The decision, as in the Wolf case, was by a divided court. Justice Douglas dissented as he did in the Wolf case, and Justice Clark declared: "Had I been here in 1949 when Wolf was decided I would have applied the doctrine of *Weeks* v. *United States* (1914), 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834], to the states. But the court refused to do so then, and it still refuses today. Thus Wolf remains the law and, as such, is entitled to the respect of this Court's membership. . . . Perhaps strict adherence to the tenor of that decision may produce needed converts for its extinction." Justices Frankfurter and Burton, who were among the majority in the Wolf case, would hold that the methods employed in the Irvine case are so repulsive that evidence so obtained must be excluded as a matter of due process of law. Not only was the court closely divided, but Justice Jackson felt it appropriate to declare for the majority: "Now that the Wolf doctrine [the guarantee of the Fourth Amendment is enforceable against the states through the Due Process Clause of the Fourteenth] is known to them, state courts may wish further to reconsider their evidentiary rules. But to upset state convictions even before the states have had adequate opportunity to adopt or reject the [exclusionary] rule would be an unwarranted use of federal power." (347 U.S. at p. 134.) Thus, after states that rely on methods other than the exclusionary rule to deter unreasonable searches and seizures have had an opportunity to reconsider their rules in the light of the Wolf doctrine, the way is left open for the United States Supreme Court to conclude that if these other methods are not "consistently enforced" and are therefore not "equally effective" (see *Wolf* v. *Colorado, supra,* 338 U.S. 25, 31), the "minimal standards" of due process have not been met.*

---

*The Wolf and Irvine cases would then be brought into line with the cases holding coerced confessions inadmissible. (*Leyra* v. *Denno,* 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948]; *Watts* v. *Indiana,* 338 U.S. 49 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801]; *Haley* v. *Ohio,* 332 U.S. 596, 601 [68 S.Ct. 302, 92 L.Ed. 224]; *Malinski* v. *New York,* 324 U.S. 401 [65 S.Ct. 781, 89 L.Ed. 1029]; *Ashcraft* v. *Tennessee,* 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192].) It is now settled that such confessions

Meanwhile, pursuant to the suggestion of the United States Supreme Court, we have reconsidered the rule we have heretofore followed that the unconstitutional methods by which evidence is obtained does not affect its admissibility and have carefully weighed the various arguments that have been advanced for and against that rule. It bears emphasis that in the absence of a holding by the United States Supreme Court that the due process clause requires exclusion of unconstitutionally obtained evidence, whatever rule we adopt, whether it excludes or admits the evidence, will be a judicially declared rule of evidence. (See *MacNabb* v. *United States,* 318 U.S. 332, 341 [63 S.Ct. 608, 87 L.Ed. 819]; *On Lee* v. *United States,* 343 U.S. 747, 756 [72 S.Ct. 967, 96 L.Ed. 1270].)

The rule admitting the evidence has been strongly supported by both scholars and judges.* Their arguments may be briefly summarized as follows:

The rules of evidence are designed to enable courts to reach the truth and, in criminal cases, to secure a fair trial

---

are excluded, not because they may lack evidential trustworthiness ("a coerced confession is inadmissible under the Due Process Clause even though statements in it may be independently established as true." *Watts* v. *Indiana, supra,* 338 U.S. 49, 50; see also *Stroble* v. *California,* 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872]), but because of the manner in which they are obtained. (See McCormick, *Developments in Admissibility of Confessions,* 24 Tex.L.Rev. 239, 245.) Lawlessness of state officials in obtaining evidence is common to both coerced confessions and unreasonable searches and seizures. Illegality, alone, of the means of getting confessions cannot be the reason the Due Process Clause compels their exclusion, for consistency would demand exclusion of evidence obtained by unreasonable searches and seizures. The difference in treatment of these two problems may arise from the fact that ordinarily coerced confessions are associated with physical coercion against the defendant's person. This element is usually not present in cases of unreasonable searches and seizures, (but see *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed 183, 25 A.L.R.2d 1396]) which may involve only minor intrusions of privacy or result from good-faith mistakes of judgment on the part of police officers. There is no reason, of course, why, if the exclusionary rule is adopted, appropriate exceptions could not be developed to govern these latter situations. On the other hand, deliberate, flagrant violations of the constitutional guarantees like those in the present case and in *Irvine* v. *California,* 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561], may be as dangerous to ordered liberty as the coercion of confessions. (See Allen, *Due Process and State Criminal Procedures,* 48 Nw.L.Rev. 16, 26-27.)

*See 8 Wigmore on Evidence [3d ed.] § 2184; Waite, *Police Regulations by Rules of Evidence,* 42 Mich.L.Rev. 679; Harno, *Evidence Obtained by Illegal Search and Seizure,* 19 Ill.L.Rev. 303; Grant, *Circumventing the Fourth Amendment,* 14 So.Cal.L.Rev. 359; Grant, *Illegally Seized Evidence,* 15 So.Cal.L.Rev. 60; Grant, *Search and Seizure in California,* 15 So.Cal.L.Rev. 139; Plumb, *Illegal Enforcement of the Law,* 24 Corn.L.Q. 337; Judge Cardozo's opinion in *People* v. *Defore,* 242 N.Y. 13 [150 N.E. 585, 44 A.L.R. 510], is perhaps the best judicial defense of this position.

to those accused of crime. Evidence obtained by an illegal search and seizure is ordinarily just as true and reliable as evidence lawfully obtained. The court needs all reliable evidence material to the issue before it, the guilt or innocence of the accused, and how such evidence is obtained is immaterial to that issue. It should not be excluded unless strong considerations of public policy demand it. There are no such considerations.

Exclusion of the evidence cannot be justified as affording protection or recompense to the defendant or punishment to the officers for the illegal search and seizure. It does not protect the defendant from the search and seizure, since that illegal act has already occurred. If he is innocent or if there is ample evidence to convict him without the illegally obtained evidence, exclusion of the evidence gives him no remedy at all. Thus the only defendants who benefit by the exclusionary rule are those criminals who could not be convicted without the illegally obtained evidence. Allowing such criminals to escape punishment is not appropriate recompense for the invasion of their constitutional rights; it does not punish the officers who violated the constitutional provisions; and it fails to protect society from known criminals who should not be left at large. For his crime the defendant should be punished. For his violation of the constitutional provisions the offending officer should be punished. As the exclusionary rule operates, however, the defendant's crime and the officer's flouting of constitutional guarantees both go unpunished. "The criminal is to go free because the constable has blundered" (Cardozo, J., in *People* v. *Defore, supra,* 242 N.Y. 13, 21), and "Society is deprived of its remedy against one lawbreaker, because he has been pursued by another." (Jackson, J., in *Irvine* v. *California, supra,* 347 U.S. 128, at 136; see also 8 Wigmore on Evidence [3d ed.] § 2184, p. 40.)

Opponents of the exclusionary rule also point out that it is inconsistent with the rule allowing private litigants to use illegally obtained evidence (see *Munson* v. *Munson,* 27 Cal.2d 659, 664 [166 P.2d 268]; *Oil Workers Intl. Union* v. *Superior Court,* 103 Cal.App.2d 512, 579-580 [230 P.2d 71]; *cf., Herrscher* v. *State Bar,* 4 Cal.2d 399, 412 [49 P.2d 832]), and that as applied in the federal courts, it is capricious in its operation, either going too far or not far enough. "[S]o many exceptions to [the exclusionary] rule have been granted the judicial blessing as largely to destroy any value it might otherwise have had. Instead of adding to the security of

444

legitimate individual rights, its principal contribution has
been to add further technicalities to the law of criminal
procedure. A district attorney who is willing to pay the price
may easily circumvent its limitations. And the price to be
paid is by no means high." (Grant, *Circumventing the Fourth
Amendment*, 14 So.Cal.L.Rev. 359.) Thus, the rule as applied
in the federal courts has been held to protect only defendants
whose own rights have been invaded by federal officers. If
the illegal search and seizure have been conducted by a state
officer or a private person not acting in cooperation with
federal officers, or if the property seized is not defendant's
the rule does not apply. (*Burdeau* v. *McDowell*, 256 U.S.
465 [41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159]; *Lustig* v.
*United States*, 338 U.S. 74, 78-79 [69 S.Ct. 1372, 93 L.Ed.
1819]; *Connolly* v. *Medalie*, 58 F.2d 629; *Kelley* v. *United
States*, 61 F.2d 843; *Parker* v. *United States*, 183 F.2d 268;
*Steeber* v. *United States*, 198 F.2d 615; *United States* v. *Stirs-
man*, 212 F.2d 900; *cf. Gambino* v. *United States*, 274 U.S. 310
[48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381].)*

Finally it has been pointed out that there is no convincing
evidence that the exclusionary rule actually tends to prevent
unreasonable searches and seizures (see Comment, 47 Nw.
L.Rev. 493, 497; *cf.* Allen, *The Wolf Case*, 45 Ill.L.Rev. 1, 20;
42 Cal.L.Rev. 120) and that the "disciplinary or educational
effect of the court's releasing the defendant for police mis-
behavior is so indirect as to be no more than a mild deterrent

---

*Since it was determined in *Wolf* v. *Colorado, supra,* 338 U.S. 25,
that the Fourth Amendment prohibitions are applicable to state officers,
it may be that evidence secured illegally by state officers is no longer
admissible in federal courts. (See Murphy, J., concurring in *Lustig* v.
*United States*, 338 U.S. 74, at p. 80 [698 Ct. 1372, 93 L.Ed. 1819]. "In
my opinion the important consideration is the presence of an illegal
search. Whether state or federal officers did the searching is of no
consequence to the defendant and it should make no difference to us."
See also *McDonald* v. *United States*, 335 U.S. 451, 456 [69 S.Ct. 191,
93 L.Ed. 153]; *United States* v. *Jeffers*, 342 U.S. 48 [72 S.Ct. 93, 96
L.Ed. 59]; Allen, *The Wolf Case*, 45 Ill.L.Rev. 1, 24.)
A distinction with respect to evidence illegally obtained by private
individuals may be justified by the fact that the constitutional pro-
visions only proscribe governmental action. "It is one thing for the
government to take advantage of information which one wrongdoer re-
veals of another, or the revelations which ensue when thieves fall out,
and quite another thing for the government to condone or encourage a
violation of the law by officers sworn to observe and enforce the law.
If peace officers are rewarded for breaching the peace, what more
potent influence could induce people generally to hold the law in con-
tempt and to break through legal barriers which stand across the path
of their desires!" (*State* v. *Owens*, 302 Mo. 348, 377 [259 S.W. 100,
32 A.L.R. 383]; see also Allen, *The Wolf Case*, 45 Ill.L.Rev. 1, 23.)

at best." (Jackson, J., in *Irvine* v. *California*, 347 U.S. 128, at pp. 136-137 [78 S.Ct. 381, 98 L.Ed. 561].)

■ Despite the persuasive force of the foregoing arguments, we have concluded, as Justice Carter and Justice Schauer have consistently maintained,* that evidence obtained in violation of the constitutional guarantees is inadmissible. *People* v. *Le Doux*, 155 Cal. 535 [102 P. 517]; *People* v. *Mayen*, 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], and the cases based thereon are therefore overruled.† We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers.

When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge. "[N]o distinction can be taken between the Government as prosecutor and the Government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." (Holmes, J., dissenting in *Olmstead* v. *United States*, 277 U.S. 438, 470 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376].) Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such "dirty business." (See *MacNabb* v. *United States*, 318 U.S. 332, 345 [63 S.Ct. 608, 87 L.Ed. 819].) Courts refuse their aid in civil cases to

---

*See dissenting opinions in *People* v. *Gonzales*, 20 Cal.2d 165 [124 P.2d 44]; *People* v. *Kelley*, 22 Cal.2d 169 [137 P.2d 1]; *People* v. *Rochin*, 101 Cal.App.2d 140, 143, 149 [225 P.2d 1, 913]; reversed by United States Supreme Court, *Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]); *In re Dixon*, 41 Cal.2d 756, 764 [264 P.2d 513].

†"[S]ince experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule." (Sutherland, J., in *Funk* v. *United States*, 290 U.S. 371, 381 [54 S.Ct. 212, 78 L.Ed 369, 93 A.L.R. 1136].)

prevent the consummation of illegal schemes of private litigants (*Lee On* v. *Long,* 37 Cal.2d 499, 502-503 [234 P.2d 9], and cases cited) ; *a fortiori,* they should not extend that aid and thereby permit the consummation of illegal schemes of the state itself. (See Roberts, J., concurring in *Sorells* v. *United States,* 287 U.S. 435, 453 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249].) It is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens observe the law. The end that the state seeks may be a laudable one, but it no more justifies unlawful acts than a laudable end justifies unlawful action by any member of the public. Moreover, any process of law that sanctions the imposition of penalties upon an individual through the use of the fruits of official lawlessness tends to the destruction of the whole system of restraints on the exercise of the public force that are inherent in the "concept of ordered liberty." (See Allen, *The Wolf Case,* 45 Ill.L.Rev. 1, 20.) "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law, it invites everyman to become a law unto himself ; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." (Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U.S. 438, 485 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376] ; see also *State* v. *Owens,* 302 Mo. 348, 377 [259 S.W. 100, 32 A.L.R. 383] ; *Atz* v. *Andrews,* 84 Fla. 43 [94 So. 329, 332] ; *Youman* v. *Commonwealth,* 189 Ky. 152 [224 S.W. 860, 866, 13 A.L.R. 1303] ; *State* v. *Arregui,* 44 Idaho 43 [254 P. 788, 792] ; *State* v. *Gooder,* 57 S.D. 619 [234 N.W. 610, 613].)

If the unconstitutional conduct of the law enforcement officers were more flagrant or more closely connected with the conduct of the trial, it is clear that the foregoing principles would compel the reversal of any conviction based thereon. Thus, no matter how guilty a defendant might be or how

outrageous his crime, he must not be deprived of a fair trial, and any action, official or otherwise, that would have that effect would not be tolerated. Similarly, he may not be convicted on the basis of evidence obtained by the use of the rack or the screw or other brutal means no matter how reliable the evidence obtained may be. (*Rochin* v. *California, supra,* 342 U.S. 165.) Today one of the foremost public concerns is the police state, and recent history has demonstrated all too clearly how short the step is from lawless although efficient enforcement of the law to the stamping out of human rights. This peril has been recognized and dealt with when its challenge has been obvious; it cannot be forgotten when it strikes further from the courtroom by invading the privacy of homes.

If the unconstitutional guarantees against unreasonable searches and seizures are to have significance they must be enforced, and if courts are to discharge their duty to support the state and federal Constitutions they must be willing to aid in their enforcement. If those guarantees were being effectively enforced by other means than excluding evidence obtained by their violation, a different problem would be presented. If such were the case there would be more force to the argument that a particular criminal should not be redressed for a past violation of his rights by excluding the evidence against him. Experience has demonstrated, however, that neither administrative, criminal nor civil remedies are effective in suppressing lawless searches and seizures. The innocent suffer with the guilty, and we cannot close our eyes to the effect the rule we adopt will have on the rights of those not before the court. "Alternatives [to the exclusionary rule] are deceptive. Their very statement conveys the impression that one possibility is as effective as the next. For there is but one alternative to the rule of exclusion. That is no sanction at all." (Murphy, J., dissenting in *Wolf* v. *Colorado, supra,* 338 U.S. 25, 41; see also *Weeks* v. *United States,* 232 U.S. 383, 393 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834].) "The difficulty with [other remedies] is in part due to the failure of interested parties to inform of the offense. No matter what an illegal raid turns up, police are unlikely to inform on themselves or each other. If it turns up nothing incriminating, the innocent victim usually does not care to take steps which will air the fact that he has been under suspicion." (Jackson, J., in *Irvine* v. *California, supra,* 347 U.S. 128, 137.) Moreover, even when it becomes generally known

that the police conduct illegal searches and seizures, public opinion is not aroused as it is in the case of other violations of constitutional rights. Illegal searches and seizures lack the obvious brutality of coerced confessions and the third degree and do not so clearly strike at the very basis of our civil liberties as do unfair trials or the lynching of even an admitted murderer. ''Freedom of speech, of the press, of religion, easily summon powerful support against encroachment. The prohibition against unreasonable search and seizure is normally invoked by those accused of crime, and criminals have few friends.'' (Frankfurter, J., dissenting in *Harris* v. *United States,* 331 U.S. 145, 156 [67 S.Ct. 1098, 91 L.Ed. 1399].) There is thus all the more necessity for courts to be vigilant in protecting these constitutional rights if they are to be protected at all. *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], was decided over thirty years ago. Since then case after case has appeared in our appellate reports describing unlawful searches and seizures against the defendant on trial, and those cases undoubtedly reflect only a small fraction of the violations of the constitutional provisions that have actually occurred. On the other hand, reported cases involving civil actions against police officers are rare, and those involving successful criminal prosecutions against officers are nonexistent. In short, the constitutional provisions are not being enforced.

Granted that the adoption of the exclusionary rule will not prevent all illegal searches and seizures, it will discourage them. Police officers and prosecuting officials are primarily interested in convicting criminals. Given the exclusionary rule and a choice between securing evidence by legal rather than illegal means, officers will be impelled to obey the law themselves since not to do so will jeopardize their objectives. Moreover, the same considerations that justify the privilege against self-incrimination are not irrelevant here. As Wigmore pointed out, that privilege, just as the prohibition against unreasonable searches and seizures, is primarily for the protection of the innocent. ''The real objection is that *any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself morally suffer thereby.* The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful

process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer,—that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system. Such seems to have been the course of experience in those legal systems where the privilege was not recognized.'' (8 Wigmore on Evidence [3d ed.] § 2251, p. 309.) ▌ Similarly, a system that permits the prosecution to trust habitually to the use of illegally obtained evidence cannot help but encourage violations of the Constitution at the expense of lawful means of enforcing the law. (See Frankfurter, J., dissenting in *Harris* v. *United States, supra,* 331 U.S. 145, 172.) On the other hand, if courts respect the constitutional provisions by refusing to sanction their violation, they will not only command the respect of law-abiding citizens for themselves adhering to the law, they will also arouse public opinion as a deterrent to lawless enforcement of the law by bringing just criticism to bear on law enforcement officers who allow criminals to escape by pursuing them in lawless ways.

It is contended, however, that the police do not always have a choice of securing evidence by legal means and that in many cases the criminal will escape if illegally obtained evidence cannot be used against him. This contention is not properly directed at the exclusionary rule, but at the constitutional provisions themselves. It was rejected when those provisions were adopted. In such cases had the Constitution been obeyed, the criminal could in no event be convicted. He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught. ''It is vital, no doubt, that criminals should be detected, and that all relevant evidence should be secured and used. On the other hand, it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole.'' (Frankfurter, J., dissenting in *Harris* v. *United States, supra,* 331 U.S. 145, 173.) The situation presented differs only in degree from other situations where the choice must be made between securing convictions by illegal means

or allowing criminals to go free. Cases undoubtedly arise where a violation of the privilege against self-incrimination, a coerced confession, the testimony of defendant's spouse, a violation of the attorney-client privilege or other privileges is essential to the conviction of the criminal, but the choice has been made that he go unpunished. Arguments against the wisdom of these rights and privileges, just as arguments against the wisdom of the prohibitions against unreasonable searches and seizures, should be addressed to the question whether they should exist at all, but arguments against the wisdom of the constitutional provisions may not be invoked to justify a failure to enforce them while they remain the law of the land.*

We are not unmindful of the contention that the federal exclusionary rule has been arbitrary in its application and has introduced needless confusion into the law of criminal procedure. The validity of this contention need not be considered now. Even if it is assumed that it is meritorious, it does not follow that the exclusionary rule should be rejected.

In developing a rule of evidence applicable in the state courts, this court is not bound by the decisions that have applied the federal rule, and if it appears that those decisions have developed needless refinements and distinctions, this court need not follow them. Similarly, if the federal cases indicate needless limitations on the right to conduct reason-

---

*"Finally, I have no fear that the exclusionary rule will handicap the detection or prosecution of crime. All the arguments that have been made on that score seem to me properly directed not against the exclusionary rule but against the substantive guarantee itself. The exclusion of the evidence is the only sanction which makes the rule effective. It is the rule, not the sanction, which imposes limits on the operation of the police. If the rule is obeyed as it should be, and as we declare it should be, there will be no illegally obtained evidence to be excluded by the operation of the sanction.

"It seems to me inconsistent to challenge the exclusionary rule on the ground that it will hamper the police, while making no challenge to the fundamental rules to which the police are required to conform. If those rules, defining the scope of the search which may be made without a warrant and the scope of a search under a warrant are sound, there is no reason why they should be violated or why a prosecuting attorney should seek to avail himself of the fruits of their violation. If those fundamental rules are open to challenge . . ., the burden is on those who challenge them to specify the modifications they deem to be desirable. I think that is a far better course than to object to the inclusion in this amendment of the one sanction which will give the constitutional provision, however it is defined, genuine meaning." Senator Robert F. Wagner speaking before the New York Constitutional Convention of 1938. (Record of the New York State Constitutional Convention 559-560, reprinted in Allen, *The Wolf Case*, 45 Ill.L.Rev. 1, 19.)

able searches and seizures or to secure warrants, this court is free to reject them. Under these circumstances the adoption of the exclusionary rule need not introduce confusion into the law of criminal procedure. Instead it opens the door to the development of workable rules governing searches and seizures and the issuance of warrants that will protect both the rights guaranteed by the constitutional provisions and the interest of society in the suppression of crime.

The orders are reversed.

Gibson, C. J., Carter, J., and Schauer, J., concurred.

SPENCE, J.—I dissent.

The guilt of the appellant is clearly demonstrated by the record before us. (See *People* v. *Cahan,* (Cal.App.) 274 P.2d 724.) He and his numerous codefendants unquestionably engaged in a far-reaching conspiracy to commit innumerable violations of the laws of the State of California. Six of his codefendants pleaded guilty and seven others, in addition to appellant, were convicted upon the trial. We have before us solely the appeal of defendant Charles H. Cahan.

Upon the trial, certain evidence was admitted over the objection that it had been illegally obtained. The learned trial judge, following precisely the nonexclusionary rule which, until the filing of the majority opinion in this case, had been firmly established as the law of this state, admitted the evidence over the objection. The nonexclusionary rule had been enunciated by this court in the relatively early case of *People* v. *Le Doux,* 155 Cal. 535 [102 P. 517], and was reiterated in *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], after the United States Supreme Court had adopted the so-called Weeks doctrine. (*Weeks* v. *United States,* 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B 834].) More recently, this court, in a well-reasoned opinion written by Mr. Justice Traynor in *People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44], again followed the nonexclusionary rule; and it similarly followed that rule in the later decisions of *People* v. *Kelley,* 22 Cal.2d 169 [137 P.2d 1], and *People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8]. Consistent adherence to the nonexclusionary rule has been further demonstrated by the denial of petitions for hearing by this court in numerous cases, only a few of which need be cited. (*People* v. *Peak,* 66 Cal.App.2d 894 [153 P.2d 464]; *People* v. *One 1941 Mercury Sedan,* 74

Cal.App.2d 199 [168 P.2d 443] ; *People* v. *Oreck,* 74 Cal.App. 2d 215 [168 P.2d 186] ; *People* v. *Tucker,* 88 Cal.App.2d 333 [198 P.2d 941] ; *People* v. *Sica,* 112 Cal.App.2d 574 [247 P.2d 72] ; *People* v. *Allen,* 115 Cal.App.2d 745 [252 P.2d 968].)

A reading of the above-mentioned authorities shows that this court has previously considered practically every argument now advanced for the adoption of the so-called exclusionary rule and has consistently determined that such arguments were outweighed by those advanced in favor of the nonexclusionary rule. In adopting and adhering to the nonexclusionary rule, the law of the State of California has thereby been kept in harmony with the law of the great majority of the other states and of all the British commonwealths; as well as in line with the considered views of the majority of the most eminent legal scholars. Only the federal courts and the courts of a relatively few states have adopted the judicially created exclusionary rule. (See appendix to *Wolf* v. *Colorado,* 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782].) It therefore appears that the great majority of the legal minds which have dealt with this problem have been in accord with the views expressed by our predecessors on this court and with the views expressed by the majority of the present members of this court as declared in *People* v. *Gonzales, supra,* 20 Cal.2d 165, and our other recent decisions. But despite this great wealth of legal precedent pointing to the desirability of the continuance of the nonexclusionary rule, the majority of this court now does a judicial turnabout and declares that *"People* v. *Le Doux,* 155 Cal. 535 [102 P. 517], *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], and the cases based thereon are therefore overruled." This is a forthright declaration but, with all due deference to the views of the majority, I cannot join in it.

I agree with the majority that ". . . in the absence of a holding by the United States Supreme Court that the due process clause requires exclusion of unconstitutionally obtained evidence, whatever rule we adopt, whether it excludes or admits the evidence, will be a judicially declared rule of evidence." The United States Supreme Court has never held that the due process clause requires such exclusion but, on the contrary, has indicated that the federal exclusionary rule "is a judicially created rule of evidence which Congress might negate." (Concurring opinion of Black, J., in *Wolf* v. *Colorado, supra,* 338 U.S. 25, 40.) California, in line with the great weight of authority, has always applied the nonexclu-

sionary rule, and if there is any virtue in the doctrine of *stare decisis,* this court should not overturn this firmly established rule in the absence of compelling reasons for such change. The difference in point of view stems from the fact that the majority apparently have found compelling reasons for such change while I have not.

If the question were an open one in this state, I would still be of the opinion that the nonexclusionary rule should be judicially declared to be the rule in California. The expression of this view does not signify that I condone any illegal search or seizure by any enforcement officer—federal, state or local—or by any other person. On the contrary, the consti-tutional and statutory rights of every citizen should be respected and protected. The law of this state provides both criminal sanctions (Pen. Code, § 146) and civil remedies for the violations of such rights; and it has been declared that the federal statutes cover violations by any person of the federal constitutional provisions. (*Irvine* v. *California,* 347 U.S. 128, 138 [74 S.Ct. 381, 98 L.Ed. 561].) Hence, the main question presented in criminal proceedings of this nature is whether the exclusionary rule, in the light of such relative advantages and disadvantages which may result from its adoption, should be preferred to the nonexclusionary rule. In determining this question we may well consider the experience under the federal rule.

The experience of the federal courts in attempting to apply the exclusionary rule does not appear to commend its adoption elsewhere. The spectacle of an obviously guilty defendant obtaining a favorable ruling by a court upon a motion to suppress evidence or upon an objection to evidence, and thereby, in effect, obtaining immunity from any successful prosecution of the charge against him, is a picture which has been too often seen in the federal practice. In speaking of an obviously guilty defendant, I refer by way of example to one from whose home has been taken large quantities of contraband, consisting of narcotics or other commodities, the very possession of which constitutes a serious violation of the law. The above-mentioned result, however, is the inevitable consequence of the application of the federal exclusionary rule in those cases in which it may be ultimately determined that a search or seizure has been made illegally, either because of the absence of a search warrant or because of some technical defect in the affidavit upon which the warrant was based. Furthermore, under the present federal practice, the trial

of the accused is interrupted to try the question of whether the evidence was in fact illegally obtained. This question is often a delicate one, and the main trial is at least delayed while the question of whether some other person has committed a wrong in obtaining the evidence has been judicially determined; and if the claim of the accused is sustained, the prosecution of the case against the accused, regardless of the fact that his guilt may appear clear, is often frustrated. The delicacy of the question results from the fact that there is still great uncertainty in the law as to the precise circumstances which will render a search or seizure ''unreasonable,'' and as to the precise nature of the defects in the affidavit which will render invalid a search warrant.

It would serve no useful purpose to reiterate all the arguments which have been advanced against the adoption of the exclusionary rule. They have been set forth in numerous authorities cited in the majority opinion in the present case and in the appendix to *Wolf* v. *Colorado, supra,* 338 U.S. 25. With commendable frankness, many of these arguments are summarized in the majority opinion here. They were discussed extensively in a learned opinion by Justice Cardozo in *People* v. *Defore,* 242 N.Y. 13 [150 N.E. 585, 44 A.L.R. 510], where the court unanimously decided against its adoption. And while it may be an overstatement to say, as does Dean Wigmore, that the exclusion of such evidence is based upon ''misguided sentimentality'' (Wigmore on Evidence, 3d ed., vol. VIII, § 2184, p. 36), it is significant that this learned writer should have felt impelled to make such statement. The fact is that the courts have been put to a difficult choice, but there is no doubt that the great majority of courts have determined that the cost of the adoption of the exclusionary rule is too great when compared to the relatively little good that it can accomplish.

The only new argument for the adoption of the exclusionary rule is based upon the fact that the United States Supreme Court has again spoken on the subject in *Irvine* v. *California, supra,* 347 U.S. 128. There the court was again divided, with the dissenting justices, under the particular facts of that case, advocating a reversal but with no unanimity as to the reasons for such reversal. The majority nevertheless affirmed the judgment of conviction and sustained the rule of *Wolf* v. *Colorado, supra,* 338 U.S. 25. While arguments in favor of any approach to the problem there presented may be found in the opinions of the several justices, I find nothing in the main

opinion which would indicate the compulsion for, or desirability of, a change in the established rule in the state. On the contrary, I find statements in the main opinion which give cogent reasons for adhering to the nonexclusionary rule.

In the Irvine case, the main opinion states at page 134: "The chief burden of administering criminal justice rests upon state courts. To impose upon them the hazard of federal reversal for non-compliance with standards as to which this Court and its members have been so inconstant and inconsistent would not be justified. We adhere to Wolf as stating the law of search-and-seizure cases and decline to introduce vague and subjective distinctions."

Again on pages 136 and 137, it is said in the main Irvine opinion: "It must be remembered that petitioner is not invoking the Constitution to prevent or punish a violation of his federal right recognized in Wolf or to recover reparations for the violation. He is invoking it only to set aside his own conviction of crime. That the rule of exclusion and reversal results in the escape of guilty persons is more capable of demonstration than that it deters invasions of right by the police. The case is made, so far as the police are concerned, when they announce that they have arrested their man. Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches. The disciplinary or educational effect of the court's releasing the defendant for police misbehavior is so indirect as to be no more than a mild deterrent at best. Some discretion is still left to the states in criminal cases, for which they are largely responsible, and we think it is for them to determine which rule best serves them."

The above-quoted language from the main opinion in the Irvine case shows that there is relatively little to be said in favor of the exclusionary rule. If that rule is "no more than a mild deterrent at best" and if "It deprives society of its remedy against one lawbreaker because he has been pursued by another," it seems clear that little good and much harm can come from its adoption. The above-quoted language also shows that this court is under no compulsion to reverse its former holdings and to adopt the federal exclusionary rule.

Furthermore, I cannot ascertain from the majority opinion

in the present case the nature of the rule which is being adopted to supplant the well established nonexclusionary rule in California. Is it the exclusionary rule as interpreted in the federal courts with all its technical distinctions, exceptions, and qualifications and embracing "standards to which [the United States Supreme] Court and its members have been so inconstant and inconsistent." (*Irvine* v. *California, supra,* 347 U.S. 128, 134.) Apparently not, for the majority opinion here assumes the validity of the contention that "the federal exclusionary rule has been arbitrary in its application and has introduced needless confusion into the law of criminal procedure." But after making passing reference to possible "needless refinements and distinctions" and "needless limitations" found in the federal cases, the majority declares that this court is free to reject the rules established by such cases, and it concludes as follows: "Under these circumstances, the adoption of the exclusionary rule need not introduce confusion into the law of criminal procedure. Instead it opens the door to the development of workable rules governing searches and seizures and the issuance of warrants that will protect both the rights guaranteed by the constitutional provisions and the interest of society in the suppression of crime."

The majority does not suggest what these "workable rules" may be nor how "confusion" may be avoided. Neither the federal courts nor the courts of any of the few states which adopted the exclusionary rule have apparently found a satisfactory solution to this problem of developing "workable rules," and it seems impossible to contemplate the possibility that this court can develop a satisfactory solution. At best, this court would have to work out such rules in piecemeal fashion as each case might come before it. In the meantime, what rules are to guide our trial courts in the handling of their problems? If the nonexclusionary rule can be said to have one unquestioned advantage, it is the advantage of certainty. On the other hand, it appears that the exclusionary rule, in the many ramifications of its application to innumerable factual situations, is fraught with such difficulty as to make the formation of satisfactory, certain and workable rules a practical impossibility.

Much of the above discussion has been directed to the undesirability of adopting the exclusionary rule if the question were a novel one in this state. Of course, the question is not a novel one, for the numerous decisions show that this state had heretofore adopted a fixed and consistent policy on the subject.

I find nothing that has occurred since the recent decisions of this court in *People* v. *Gonzales, supra,* 20 Cal.2d 165, *People* v. *Kelley, supra,* 22 Cal.2d 169, and *People* v. *Haeussler, supra,* 41 Cal.2d 252, to furnish compelling reasons for this court to enunciate a change of that policy.

If, however, reasons may be said to exist for a change in the established policy of this state, I believe that the Legislature, rather than the courts, should make such change. This is particularly true in a situation such as the present one, when the change of policy should be accompanied by "workable rules" to implement such change. Otherwise, this court, by the sweeping repudiation of its past decisions, launches the administration of justice upon an uncharted course which the trial courts will find great difficulty in following. In this connection, it is worthy of note that bills have frequently been introduced in the Legislature to accomplish precisely that which is accomplished by the majority opinion, to wit: the supplanting of the nonexclusionary rule by the so-called exclusionary rule, without prescribing any "workable rules" for the latter's application. In the recent legislative sessions of 1951 (see Senate Bill No. 1689 and Assembly Bill No. 3120) and of 1953 (see Assembly Bills Nos. 2896 and 3126), such bills have been introduced but none has ever been brought to a vote in either house. Under the circumstances, it would be far better for this court to allow the Legislature to deal with this question of policy, for the Legislature could accompany any desired change with needed legislation establishing the rules to guide our courts in the application of the new policy.

Returning to the precise situation presented by the record before us, it may be conceded that the illegality in obtaining the evidence was both clear and flagrant. It may be further conceded that the crimes which defendants conspired to commit were not in the class of the more serious public offenses. The fact remains, however, that the exclusionary rule, as adopted by the majority, is a rule for all cases and that it deprives society of its remedy against the most desperate gangster charged with the most heinous crime merely because of some degree of illegality in obtaining the evidence against him. Thus, it appears that the main beneficiaries of the adoption of the exclusionary rule will be those members of the underworld who prey upon law-abiding citizens through their criminal activities. It further appears that the adoption of the exclusionary rule will inevitably lead to unnecessary con-

fusion, delay and inefficiency in the administration of justice. Such is the price that society must pay for the adoption of the exclusionary rule, a rule of uncertain nature and doubtful value which is ''no more than a mild deterrent at best.''

In my opinion, the cost of the adoption of the exclusionary rule is manifestly too great. It would be far better for this state to adhere to the nonexclusionary rule, and to reexamine its laws concerning the sanctions to be placed upon illegal searches and seizures. If the present laws are deemed inadequate to discourage illegal practices by enforcement officers, the Legislature might well consider the imposition of civil liability for such conduct upon the governmental unit employing the offending officer, in addition to the liability now imposed upon the officer himself. It might also consider fixing a minimum amount to be recovered as damages in the same manner that a minimum has been fixed for the invasion of other civil rights. (Civ. Code, § 52.) These methods would be far more effective in discouraging illegal activities on the part of enforcement officers and such methods would not be subject to the objection, inherent in the adoption of the exclusionary rule, that ''It deprives society of its remedy against one lawbreaker because he has been pursued by another.'' (*Irvine* v. *California, supra,* 347 U.S. 128, 136.)

In my opinion, we should adhere to our prior decisions and affirm the judgment.

Shenk, J., and Edmonds, J., concurred.

Respondent's petition for a rehearing was denied May 25, 1955. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.