[S.F. No. 23906. Aug. 23, 1979.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
MARK MEYERS, Real Party in Interest.

## Counsel

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Gloria F. DeHart and Jamie Jacobs-May, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Harold J. Truett, Public Defender, and Frank J. Cox, Deputy Public Defender, for Real Party in Interest.

## OPINION

**TOBRINER, J.**—In this case we uphold against constitutional attack an efficient and unintrusive procedure of law enforcement: the police, in execution of a valid warrant to search defendant's premises for stolen goods, may properly seize items which defendant's victims identify as their property. In the instant case, victims of a burglary accompanied a police officer in the execution of a warrant to search defendant's house for more than 60 specified items of valuable personal property. In the course of the intensive search which ensued, the victims identified several dozen other articles of nominal value that had also been stolen in the burglary. On the basis of the victims' identification, the police seized a quantity of these items.

On defendant's motion, the trial court suppressed evidence of all items seized which were not enumerated in the warrant. The People now seek review of that ruling, contending that the victims' on-the-scene identification of property as contraband cloaked the police with constitutional authority to seize evidence in plain sight.

As we shall explain, the highly effective procedure which the police employed in the present case to identify and seize stolen property did not violate defendant's constitutional guarantees against unreasonable searches and seizures (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13). ▇ Thus we hold that the victims of a burglary may accompany police in the execution of a valid search warrant in order to identify stolen property of theirs which they have reason to believe will be found on the suspect's premises. Accordingly, because the police uncovered contraband in the instant case in such fashion, we direct the trial court to vacate its order of suppression.

The undisputed facts disclose that on May 21, 1977, Juanita Lane returned from vacation with her husband to their suburban home at 257 Emerystone Terrace, Marinwood. On entering, the Lanes discovered that the house had been burglarized: it was in a "shamble like a hurricane had

gone through every room . . . . Every closet had items removed from them."

An immediate inquiry of her neighbors led Mrs. Lane to suspect the tenants of the house at 268 Emerystone, including defendant Mark Meyers. When Mrs. Lane asked the police for an "immediate search warrant on this house," however, the police refused "without evidence." Mrs. Lane explained that "because of the amount of liquor that had been stolen from my home, I was entertaining the thought at that point there might be empty liquor bottles belonging to us that I could positively identify in [the suspects'] garbage can," but the police were not persuaded, and cautioned Mrs. Lane not to undertake a search without the tenants' permission.

Notwithstanding the police warning, the Lanes entered defendant's garage that evening. Their search revealed a liquor bottle, a plastic orchid, a distinctively decorated iced tea glass, and "one card from a deck of playing cards that had been taken out of my tea cart drawer." The Lanes notified the police of their discovery, and delivered to the police a partial report of items which they knew were missing from their house: "at the time we were told that this was sufficient—sufficient inventory to warrant the search warrant, that we needn't give all the items. [¶] We didn't even know everything at that point that was taken."

Based upon Mrs. Lane's affidavit attesting that a detailed list of more than 60 items of valuable personal property, including a coin collection, silver, guns, jewelry, camera equipment, and furs, were concealed at 268 Emerystone, the Municipal Court of Marin County issued a warrant commanding "any sheriff, constable, marshal, policeman or police officer in the County of Marin" to make immediate search of the premises. Instructing the Lanes to return home until further notice, Sergeant Riddell of the Marin County Sheriff's Department served the search warrant on the occupans of 268 Emerystone, secured the house with a "cursory check" to make sure no one else was inside, and then summoned Mr. and Mrs. Lane to the premises.

Sergeant Riddell later described the procedure he followed during the ensuing search. Using the Lanes as "the source of identifying the property," Riddell "[w]ent from room to room looking for stolen property that might belong to [Mrs. Lane]. . . . As I went through the room looking through drawers and closet space, [Mrs. Lane] inquired or made statements to the effect that property was or was not hers. . . . Each and

every item in the room was looked at. . . . By myself and the Lanes." The victims scrutinized "thousands" of items in a search of the entire house, and, while none of the items listed in the search warrant was found, the Lanes were able to identify over 80 miscellaneous other items of nominal value as property stolen in the burglary.[1]

Defendant was charged with receiving stolen property (Pen. Code, § 496). On October 7, 1977, defendant filed a pretrial motion to suppress evidence acquired as a result of the search of 268 Emerystone, alleging that "the officer did not in good faith execute the warrant but instead engaged in a general exploratory search (Penal Code Section 1538.5(2) (iv)."[2] On November 9, 1977, the trial court granted defendant's motion to suppress.[3]

■ The Fourth Amendment of the federal Constitution, article I, section 13 of the California Constitution, and section 1525 of the Penal Code articulate the general rule that the terms of a search warrant limit any search or seizure undertaken pursuant to the warrant.[4] Thus the police may search only the premises prescribed in the warrant, and may seize only the property described in the warrant. The United States Supreme Court expressed the rationale for this rule in these words: "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. . . . [N]othing is

---

[1]On June 2, 1977, Sergeant Riddell filed a return of warrant and an inventory of property seized. Typical of the items seized were a "mattress cover, white in color," "Chanel #19 Eau de Cologne box with bottle inside," "black hand towel," "one box of sparklers containing one sparkler," and "three frozen cakes wrapped up in aluminum foil, identified by victim as being made by her Grandmother."

[2]Section 1538.5 provides in part:

"(a) A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on either of the following grounds:

"(1) The search or seizure without a warrant was unreasonable.

"(2) The search or seizure with a warrant was unreasonable because (i) the warrant is insufficient on its face; (ii) the property or evidence obtained is not that described in the warrant; (iii) there was not probable cause for the issuance of the warrant; (iv) the method of execution of the warrant violated federal or state constitutional standards; (v) there was any other violation of federal or state constitutional standards."

[3]The trial court's order provided, inter alia, "All items of evidence or stolen property seized from areas of the house identified as being Mark Meyers' private room . . . are suppressed UNLESS they are specifically described in the Search Warrant itself, and [¶] . . . All items of evidence or stolen property seized from common areas of the house are suppressed UNLESS they are specifically described in the Search Warrant itself . . . ."

[4]Section 1525 provides: "A search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched."

left to the discretion of the officer executing the warrant." (*Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed.231, 237, 48 S.Ct. 74].)

The rule that the police may seize only those articles enumerated in the warrant is not, however, without limitation. *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485] formulates the "plain sight" exception as follows: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." (*Id.,* at p. 157.)[5]

*Skelton* reflects our earlier, pragmatic recognition in *People* v. *Roberts* (1956) 47 Cal.2d 374, 379 [303 P.2d 721], that ". . . in the course of conducting a reasonable search [police officers] d[o] not have to blind themselves to what [i]s in plain sight simply because it [i]s disconnected with the purpose for which they entered." (See *Skelton* v. *Superior Court, supra,* 1 Cal.3d at pp. 157-158.) Thus in *Skelton* we upheld the right of officers legally on the premises to seize articles which were "reasonably identifiable as contraband" on the rationale that it represented "a realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion." (*Id.,* at p. 158.)

In recognizing a "plain sight" exception to the general warrant requirement we did not, however, intend to violate the fundamental proposition that the scope of a search must be circumscribed by the reasons which justified its inception. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 18 [20 L.Ed.2d 889, 903-904, 88 S.Ct. 1868].) Thus in *People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872], we fashioned a "nexus rule" to prohibit police officers, in the course of a lawful search, from indiscriminately seizing any items whatsoever. "The police officers who seize an article must be presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred. . . .

---

[5]The "contraband" at issue in *Skelton*, as in the present case, consisted of allegedly stolen property, including jewelry. (See 1 Cal.3d at p. 149.)

[P]ure speculation . . . will not suffice to establish the requisite nexus." (*Id.,* at p. 763.)

In the present appeal, the People address themselves to the plain sight rationale discussed above. Defendants do not contend that the warrant before us, which directed a search for, and seizure of, some 60 specific items of stolen property, was not sufficiently definite or particular. Moreover, the People persuasively urge that Officer Riddell was engaged in a good faith effort to execute the valid warrant to search defendant's residence and discover the denominated property when he uncovered and confiscated several dozen other miscellaneous items of stolen property. Thus the People argue that the property seized, although not mentioned in the warrant which authorized the search, may be admitted against defendant.

■ We have concluded that the circumstances of the case indeed justified the officer's seizures. Based upon a detailed and highly descriptive affidavit supplied to police by the burglary victim immediately after discovery of the crime, the magistrate properly issued a warrant directing a search of the entire premises at 268 Emerystone. The warrant mandated, in very particular terms, that Police Officer Riddell conduct a search for, and seizure of, some five dozen items of personal property. Specifically enumerated in the warrant were the victims' more valuable possessions: as Mrs. Lane admitted, "We didn't know everything at that point that was taken. These were obvious things we knew were missing."

The warrant thus clearly authorized the police officer to whom it was directed to make an extensive search of the entire house, looking into any places where he might reasonably expect that such small and easily secreted items as a "small gold spoon" or a "jade pin" might be hidden. As in *Skelton,* "[w]ith the issuance of this warrant, the judgment had already been made by a judicial officer to permit a serious invasion of [the defendant's] privacy." (1 Cal.3d 144, 158.) Considering the nature and number of the objects named in the warrant, Officer Riddell could undoubtedly have had the assistance of fellow police officers in conducting the search prescribed; the presence of the burglary victims, acting essentially in the capacity of police agents instead of other officers, represented no significant additional intrusion upon defendant's privacy.

Moreover, by pointing out to Officer Riddell items of their stolen property, Mr. and Mrs. Lane provided the requisite "rational link" between the articles confiscated and possible criminal behavior by

defendant. Admittedly the items of personal property seized were not obvious objects of contraband: as Officer Riddell testified, "but for Mr. and Mrs. Lane being present" he would not have known which property on defendant's premises was stolen. Nevertheless, the Lanes articulated specific facts[6] from which Officer Riddell reasonably inferred that the articles seized were in fact contraband.[7] The Lanes accompanied the officer not as a substitute for specificity in the search warrant, but solely to provide precise identification of contraband.

A recent decision by the high court of one of our sister states further supports our conclusion that the present search did not unconstitutionally exceed the scope of the warrant which authorized it. In *State* v. *Scigliano* (1978)[8] 120 Ariz. 6 [583 P.2d 893], the police obtained a warrant to search defendant's premises on the basis of information supplied by two persons who admitted having stolen furniture and having sold it to defendant. In executing the warrant the police brought one of the informants with them for the search; she pointed out to the officers other items not specified in the warrant, "which she recognized as having been stolen by her or Brian and delivered to the defendant." (*Id.*, at p. 894.) These additional items were seized and ultimately admitted into evidence at trial.

On appeal, the Supreme Court of Arizona upheld the trial court's admission of evidence against defendant Scigliano's constitutional challenge. As the court held, "The record clearly supports the conclusion that the officers were on Scigliano's premises pursuant to execution of a valid search warrant and that the challenged items (those seized but unnamed in the warrant) of furniture were found during a limited search which was reasonably calculated to locate items actually named in the warrant, as opposed to a general exploratory search of the premises. We also believe that the facts surrounding the search, including information supplied by the informant during that search, provided a sufficient nexus between the disputed items and the crime for which the warrant was issued, so that the

---

[6]Thus, for example, Mrs. Lane was able to identify a bottle found in defendant's room "Because of the design on it. Whether this bottle had a pink liquor seal or not, I don't know. We do buy all our liquor in Nevada. This seal would probably prove it was purchased in Nevada."

[7]A single item seized, however, does not satisfy the nexus test. Officer Riddell seized an automobile tape deck on the ground "Possibly that it might be stolen. . . . It was hidden beneath the bed or put underneath the bed." The Lanes did not claim the tape deck as theirs. Officer Riddell therefore improperly seized the tape deck on the basis of mere speculation.

[8]The Arizona high court decided *Scigliano* on July 25, 1978, more than eight months after the trial court's ruling in the case before us.

officers had probable cause to believe that those items were 'reasonably related' to the crime." (583 P.2d 893, 896.) Seeing "no greater intrusion into personal security and privacy, and hence no constitutional prohibition, in the use of the informant at the scene of the execution of [a valid search] warrant," the court affirmed the trial court's denial of defendant's motion to suppress the undescribed items. (*Id.*)

We agree that no constitutional prohibition forbids the use of the burglary victims in the present case from assisting the police in the execution of their valid warrant to search. No purpose would be served, "other than that of an exquisite formalism" (*Skelton* v. *Superior Court, supra,* 1 Cal.3d 144, 158), by requiring that when Officer Riddell discovered unenumerated contraband or items which he suspected to be contraband he return to the issuing magistrate and obtain a second warrant directing the seizure of the additional contraband. Nothing in the present record indicates that Officer Riddell originally secured a search warrant as a pretext to conduct a general exploratory search of defendant's residence. Nor is there any evidence of vindictiveness or other improper motivation on the part of the burglary victims. The circumstances of the burglary rendered an exhaustive inventory of stolen property impossible. As Mrs. Lane stated, "Every closet had items removed from them. . . . We didn't even know everything at that point that was taken." To require the victims of a massive burglary to recall every missing face-cloth and coffee pot is to require the impossible. The procedure which the police pursued in the present case reasonably accommodated the legitimate interests of effective law enforcement without seriously impinging upon defendant's right to be secure in his house and effects against indiscriminate governmental intrusion.[9]

---

[9]Defendant relies on *People* v. *Superior Court (Williams)* (1978) 77 Cal.App.3d 69 [143 Cal.Rptr. 382] for the conclusion that the police procedure in the instant case violated his constitutional right against unreasonable searches and seizures.

In *Williams* an informant who had been involved in the crimes with which defendant Williams was charged supplied the basis for the issuance of a warrant to search Williams' residence for stolen oil well drilling equipment. Several police officers executed the warrant at the residence. As a result of the search the officers seized a large number of items which the informant claimed were stolen, although only a few were described in the warrant.

To assist the officers in the search, the informant accompanied them to Williams' residence and pointed out not only where they might find incriminating evidence, but also what items had been stolen. One detective testified that without the informant's assistance he would have had no idea what items to seize. Based on the ground that the warrant was too general, the trial court suppressed all but 11 items.

The appellate court rejected the People's assertion that even if the warrant were too general with respect to the items seized, the police officers still had authority to seize under the plain view doctrine. As the court held, "We decline to expand the plain view doctrine[,] which is designed to place a reasonable limit on the police discretion without

We appreciate the concerns voiced by the dissent. Ideally, as the dissent notes, the warrant should describe all the stolen property in such detail and with such distinctive marks that a police officer totally unfamiliar with the property could identify and seize it from the description in the warrant. In the present case, this ideal could not possibly be attained. Well over a hundred items were stolen. The Lanes could not recall everything that was taken, nor could they describe many items with sufficient and distinctive detail to guide the executing officers. Under these circumstances the only practical way the police could either distinguish the items listed in the warrant or identify and recover other stolen property in plain sight during the search was to seek the assistance of persons able to identify the property in question. We do not believe either state or federal Constitutions require the police to forego such assistance.

The dissent also suggests that the failure of the police to consult and refer to the warrant transforms the search into an unlawful exploratory search. The warrant itself authorized a search which would explore into every corner and cranny which might conceal items as small as a jewelry pin. The fact that the officers did not refer to the warrant during the search did not extend the scope or time of the search beyond that authorized by the magistrate; the method of search that was followed— presenting items to the Lanes for identification—was one likely to turn up the property listed in the warrant if such property were present; the stolen property found in plain sight would still have been in plain sight had the police glanced from time to time at the warrant. In short, even though the officers failed to refer to the warrant during the search, the search actually conducted fell within the scope of that authorized by the warrant, and thus was not an illegal general search.

The recent decision of the United States Supreme Court in *Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319, [60 L.Ed.2d 920, 99 S.Ct. 2319], does not cast doubt upon the constitutionality of the present search. In *Lo-Ji,* a magistrate authorized seizure of two copies of obscene films, then accompanied police officers to defendant's store to determine on the spot

unreasonable interference with police activity (see *Skelton* v. *Superior Court, supra,* 1 Cal.3d 144, 158) to permit seizure of items pointed out at the scene by informants. Such a doctrine would unduly encroach upon the . . . right to be free from *unreasonable* searches and seizures." (Original italics.) (77 Cal.App.3d 69, 79-80.)

While the court in *Williams* invalidated the search at issue in part because it was based upon a warrant of insufficient particularity, we disapprove *Williams* to the extent that it would prohibit a third party's on-the-scene identification of contraband during the execution of a valid search warrant. (77 Cal.App.3d 69, 78-80.)

what other merchandise was also obscene. The magistrate and officers examined and seized hundreds of items, which they subsequently added to the warrant. The Supreme Court ruled that the search violated the Fourth Amendment.

Unlike the present case, the officers and magistrate in *Lo-Ji* did not discover additional items subject to seizure in the course of a good faith attempt to locate the property listed in the warrant. To the contrary, although the *Lo-Ji* warrant actually specified only copies of two films, the officers and magistrate decided before entering the store that they would pursue a search beyond the specified copies of two films and examine virtually every item on the premises. Thus in *Lo-Ji* the area of the search did not fall within the scope authorized by the specification of the warrant; instead the police and the magistrate intended from the onset to revise the warrant to correspond to the wide breadth and extent of the search.

In short, the magistrate in *Lo-Ji* issued what purported to be an open-ended warrant, which he filled in and completed only after the search was concluded. Consequently the warrant, instead of restraining the scope of the search, "left it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure." (442 U.S. 319, 325 [60 L.Ed.2d 920, 928, 99 S.Ct. 2319, 2324].) In the present case, by way of contrast, the officers exercised no discretion, but seized only items in plain view identified to them by a reliable witness as stolen property.

Footnote 5 of the Supreme Court opinion suggests another ground which distinguishes the present case from *Lo-Ji*. As in the case at bar, the state in *Lo-Ji* defended the seizure on the ground that the items seized were in plain view. The Supreme Court, however, observed that "we have recognized special constraints upon searches and seizures of material arguably protected by the First Amendment [citations]; materials normally may not be seized on the basis of alleged obscenity without a warrant." (442 U.S. 319, 326 fn. 5 [60 L.Ed.2d 920, 928, 99 S.Ct. 2319, 2324].) Unlike obscene matter, stolen property found in plain view may be seized without a warrant.

 We have concluded, therefore, that the police officer in seizing items not denominated in the warrant transgressed no constitutional principle. We recognize that the distinguished trial judge in the instant case may have followed prior decisions, which he may have regarded as

controlling, but we believe that the situation here justified a more realistic and less formalistic approach, and that the cases do not foreclose it.

■ The People also challenge the trial court's ruling suppressing "all items seized as evidence or stolen property found at the residence described in the search warrant which was located in rooms identified as being the private rooms of individuals other than [defendant]." The People correctly contend that Officer Riddell had authority to enter and search every room of defendant's residence, including private bedrooms of defendant's housemates. The warrant mandated a search of "those certain premises, including all rooms and buildings used in connection with the premises and adjoining same, and in any receptacle or safe therein, which premises are commonly called and designated as 268 Emerystone, Marinwood. . . ." The affidavit supporting the search warrant plainly indicated to the issuing magistrate that several individuals shared the house at 268 Emerystone as a communal residence. In light of the type and quantity of items stolen from the victims, the magistrate did not err in authorizing a search of the entire premises, nor did Officer Riddell exceed the limits of a reasonable search in seizing items from all rooms of the house. (See *People* v. *Garnett* (1970) 6 Cal.App.3d 280, 286-287 [85 Cal.Rptr. 769].) We therefore conclude that the trial court erred in suppressing evidence seized from rooms identified as being the private rooms of individuals other than defendant Meyers.

Let a writ of mandate issue directing the trial court to vacate its order insofar as it suppresses all items seized as evidence of stolen property not listed in the warrant, other than the automobile tape deck, and insofar as it suppresses all items seized as evidence of stolen property found in rooms identified as being the private rooms of individuals other than defendant.

Clark, J., Richardson, J., and Manuel, J., concurred.

**MOSK, J.**—I dissent.

The majority misread the Fourth Amendment to the Constitution of the United States and article I, section 13, of the California Constitution. Since their adoption both have clearly provided that the warrant—not the victims of the crime—must "particularly describe" the place to be searched and the "things to be seized." Neither Constitution authorizes the guileful evasion devised here, in which the police used the warrant

merely to gain admission to the premises and the victims marched in with them to select the property to be seized.

The facts of the case graphically illustrate the vice of this technique. The warrant issued by the magistrate to Sergeant Riddell described 60 items of personal property allegedly located in defendant's house. *The police did not find a single one of those 60 items.* Instead, as the majority quote, Sergeant Riddell testified that he and the victims "[w]ent from room to room . . . looking through drawers and closet space . . . ." In this process "Each and every item was looked at," every room of the house was searched, "thousands" of articles were scrutinized, and more than 80 pieces of personal property were seized—not one of which had been described in the warrant.

Contrary to the claim of the majority, this is manifestly a general exploratory search of the very type the warrant clause of the Constitution was designed to outlaw. (See *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 795-796 [13 Cal.Rptr. 415, 362 P.2d 47], and cases cited.) It also violates the statutory requirement of particularity in the warrant. (Pen. Code, §§ 1525, 1529.) And by the same token the remedy is proper: the Legislature has expressly authorized a motion to suppress when, as here, the police act under color of legal process but "the property or evidence obtained is not that described in the warrant" (Pen. Code, § 1538.5, subd. (a)(2)(ii)).

In a vain attempt at justification the majority invoke the variation on the "plain sight" exception that we formulated in *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485], i.e., "When officers, in the course of *a bona fide effort to execute a valid search warrant,* discover articles which, although not included in the warrant are *reasonably identifiable as contraband,* they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." (Italics added.) The reliance is misplaced for at least two reasons.

As with each of the few permissible excuses for noncompliance with the warrant rule (see, e.g., *Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; *People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261]), the *Skelton* exception is narrowly circumscribed and the burden is on the People to demonstrate compliance with each precondition to its applicability. (*People* v. *Murray* (1978) 77 Cal.App.3d 305, 310-311 [143 Cal.Rptr. 502].) As the empha-

sized language indicates, the *Skelton* exception is inapplicable unless the unlisted articles that the police propose to seize are (1) discovered in a "bona fide effort" to execute the warrant and are (2) "reasonably identifiable as contraband." Neither condition is satisfied here.[1] Yet the restrictions are essential to protect the warrant process against abuse and to prevent indiscriminate seizure of property in the unfettered discretion of the police. (*Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74]; *People* v. *Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872].)

The requirement of a "bona fide effort" to execute the warrant is explicated in *Skelton* itself. Reviewing the record of that case, we found an "absence of any substantial evidence as to the officers' motivation" in seizing property not specified in the warrant; we illustrated the point by noting, "it does not appear for example that they deliberately delayed looking for or discovering the items listed in the warrant" (1 Cal.3d at p. 158, fn. 12). By contrast, in the case at bar there was not only such a deliberate delay in looking for the listed items—the police never even began to do so. As will appear, the record negates any possible claim of bona fides.

Thus Sergeant Riddell repeatedly admitted on cross-examination that he made no effort to look for the 60 articles described in the warrant; rather than consulting that list as he entered each room of defendant's house, he simply took every item of personal property in the room and asked Mr. and Mrs. Lane, the burglary victims, if it was theirs.[2] In her testimony Mrs. Lane confirmed this fact, and added that she did not see the warrant at any time during the search; apparently it remained in Officer Riddell's pocket throughout the entire proceedings. Nor was the incompleteness of the stolen property list in the warrant an oversight: Mrs. Lane identified in court a number of articles seized by the police that she had known were stolen but had not specified in her affidavit for the warrant; she testified without contradiction that she had left them out because the police had advised they had a "sufficient inventory" to procure a warrant and she need not tell them of "all the items" to be seized.[3]

---

[1] The exception is also unavailable unless the warrant that the police are in the process of executing is "a valid search warrant." Defendant does not question the validity of the warrant in the case at bar.

[2] The relevant testimony is quoted in an appendix to this opinion.

[3] "Q. [by the deputy district attorney]. After you discovered that your residence had

The Constitution commands, however, that the warrant specify the "things to be seized"—not merely "enough of the seizable things to persuade the magistrate to allow the police to enter and search for more." Yet that is essentially what happened here. Although Sergeant Riddell went through the motions of obtaining a warrant, his ensuing actions prove that he intended to use it simply as a license to get inside defendant's house; having done so, he admittedly ignored the list of property specified in the warrant, searched every nook and cranny of the premises, and seized every article selected for him by the Lanes. In other words, after he had gained entry into the premises the officer was obviously no more interested in the warrant than a theatergoer is concerned with his ticket once he has been seated. No court in the land should countenance a scheme that reduces the high office of a search warrant to the level of a mere ticket of admission. Certainly on this record it cannot be said that the bona fides requirement described in *Skelton* has been met. As we recognized in that decision (1 Cal.3d at pp. 154-155, fn. 8), "Just as an arrest may not be used as a pretext to conduct a general search of a person's premises for incriminating evidence (see *People* v. *Roberts* (1956) 47 Cal.2d 374, 378 [303 P.2d 721]), where the right to conduct a search is obtained ostensibly for one purpose, it may not be used in reality for another." Indeed, "It is by this rational limitation that the Fourth Amendment protects the individual against unfettered discretion." (*People* v. *Hill* (1974) *supra,* 12 Cal.3d at p. 762.)

A recent decision of the United States Supreme Court is in point. (*Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319 [60 L.Ed.2d 920, 99 S.Ct. 2319].) There a police investigator purchased two reels of film from an "adult" bookstore; after viewing them, the local town justice concluded they were obscene. The investigator asserted in an affidavit that additional "similar" material could be found on the premises, and

---

been apparently burglarized or in the condition that you described, did you make an inventory of the items that were taken? A. Yes, sir, we did.

"⋯ ⋯ ⋯ ⋯ ⋯ ⋯ ⋯

"Q. Was that inventory of items that were apparently taken from your residence reduced to the list that is shown in the affidavit and the search warrant? A. The items on the search warrant was [*sic*] only a partial list, and at the time we were told that this was sufficient—sufficient inventory to warrant the search warrant, that we needn't give all the items."

With respect to these known but unspecified articles, of course, it is clear that no exigency existed. The police had probable cause to believe they were located on defendant's premises, and could easily have included them in the affidavit and warrant. As to them, accordingly, any "emergency" that arose on the scene was of Officer Riddell's own making and cannot justify invoking an exception to the warrant requirement. (*United States* v. *Hare* (6th Cir. 1979) 589 F.2d 1291, 1293.)

the justice issued a warrant for the search of the store. The only "things to be seized" described in the warrant, nevertheless, were the two reels of film previously purchased; the affiant requested the justice to accompany him to the store in order to determine which additional materials should be seized. Pursuant to that request, the justice entered the store with a group of police officers and participated in a lengthy search of the premises. Hundreds of items were examined and seized as obscene; they were not listed in the warrant, however, until the search was over.

The United States Supreme Court unanimously reversed the ensuing conviction, reasoning that "This search warrant and what followed the entry on petitioner's premises are reminiscent of the general warrant or writ of assistance of the 18th century against which the Fourth Amendment was intended to protect. [Citations.]" (*Id.,* at p. 325 [60 L.Ed.2d at p. 927].) The procedure was unlawful because "the warrant left it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure. The Fourth Amendment does not permit such action. [Citations.] Nor does the Fourth Amendment countenance open-ended warrants, to be completed while a search is being conducted and items seized or after the seizure has been carried out." (*Ibid.* [60 L.Ed.2d at pp. 927-928].) The high court put aside the state's reliance on the "plain view" doctrine, emphasizing that "the search began and progressed pursuant to the sweeping open-ended authorization in the warrant" and "it expanded into a more extensive search because other items were found the local justice deemed illegal." (*Ibid.* [60 L.Ed.2d at p. 928].)

It is true that in the case at bar the warrant described a substantial number of items to be seized; but as shown above it is also true that the police in fact listed only enough items to obtain the warrant, then ignored that list and seized instead every item claimed by the Lanes to be stolen. *Lo-Ji Sales* teaches that the Fourth Amendment does not permit such "open-ended warrants, to be completed while a search is being conducted and items seized." Indeed, if it was unlawful in that case for the town justice himself to enter the premises with the police and identify the items to be seized, it was a fortiori unlawful for the private parties in the case at bar to do the same.

Nor have the People satisfied the requirement of *Skelton* that the unlisted contraband seized be "reasonably identifiable" as such. The

facility with which contraband is identifiable when discovered by a police officer in the process of executing a search warrant evidently varies from case to case. Some articles are recognized to be contraband by any officer (e.g., a sawed-off shotgun or commonly used narcotics), while others can be recognized by specially trained agents (e.g., sophisticated explosives or unusual illicit drugs); the latter are therefore not "reasonably identifiable" within the meaning of *Skelton.* When the property is deemed "contraband" because it is stolen,[4] a similar situation arises: some goods are recognizable by any police officer as probably stolen, either because of their identification markings[5] or because of such suspicious circumstances as their atypical location, condition, or quantity; while others have no distinctive features, and cannot be so recognized without the assistance of a third person having particular knowledge of their ownership. Again the latter are not "reasonably identifiable" by the officer within the meaning of *Skelton,* and the bulk of the property seized in the case at bar falls within that class.[6]

The majority admit that here "the items of personal property seized were not obvious objects of contraband," and that without the assistance of the victims Officer Riddell "would not have known which property on defendant's premises was stolen." (*Ante,* p. 75.) The majority nevertheless claim on two grounds that the officer's reliance on the victims to identify the property to be seized as contraband did not violate the letter of *Skelton* and the spirit of the Constitution. As will appear, however, neither ground is tenable.

First the majority argue that because Sergeant Riddell could have had the assistance of fellow police officers in conducting the search, his use of the victims instead for this purpose resulted in "no significant additional intrusion upon defendant's privacy." (*Ante,* p. 74.) Reality, I submit, is otherwise. A police officer has no personal interest in the property to be seized in a search for stolen goods; he is therefore able to conduct himself objectively in looking for and identifying that property. The victim of the

---

[4]As we indicated in *People* v. *Hill* (1974) *supra,* 12 Cal.3d 731, 762, quoting from *Warden* v. *Hayden* (1967) 387 U.S. 294, 307 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642], under this exception stolen property may also be seized as the "fruits" of crime.

[5]For example, among the items seized in defendant's house were a leather case with the name and address of Mr. Lane stamped on it, and a lady's handbag containing personal papers in the name of Mrs. Lane.

[6]E.g., costume jewelry, personal and desk accessories, clothing, and linens. In this category of goods seized, however, were some that are so generally available and so fungible that it is difficult to conceive how they could be positively identified by anyone, e.g., brand named canned goods (Green Giant Sweet Peas, Del Monte Whole Green Beans) and liquor (Canadian Mist, LeJon Brandy).

theft, by contrast, is both deeply interested in the proceedings and lacks the officer's training and experience. Accordingly, either because of the excitement engendered by the prospect of recovering his goods, or the confusion resulting from seeing such goods intermingled with the property of another in a strange environment, or a feeling of vindictiveness towards the person who purportedly stole from him, or even ordinary greed—or indeed a combination of these emotions—there is a risk that some victims will lead the police to unnecessarily broaden or lengthen the search or to seize property not actually stolen from them. The fact that the majority choose to ignore these differences between policemen and victims does not make the risk any less real.

Secondly, the majority attempt to satisfy the "nexus" requirement we set forth in *People* v. *Hill* (1974) *supra*, 12 Cal.3d 731, 763, i.e., "The police officers who seize an article must be presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred." It is argued that "the Lanes articulated specific facts" from which Officer Riddell could reasonably infer that the items seized had been stolen from them. (*Ante*, p. 75.) The record, unfortunately, does not support this claim. To begin with, in the testimony of Mrs. Lane relied on by the majority the witness does *not* recount how she identified various items of property to Officer Riddell during the course of the search; instead, she simply explains how she can identify such items when they are presented to her in court by the deputy district attorney.[7] In any event, while more than 80 items not listed in the warrant were seized by Officer Riddell, Mrs. Lane was asked on the stand about only a dozen of them; the record is silent as to her means, if any, of identifying the rest. And even as to those few, her "identification" was usually no more than a brief description of the obvious physical attributes of the article—e.g., its condition, shape, or color—all readily apparent to any casual observer.[8]

---

[7]Thus the question of the prosecutor which elicits the response quoted by the majority (at fn. 6) is not "How did you identify this bottle to Officer Riddell?" But "How can you identify [i.e., in court] this particular bottle as belonging to you? Is there anything you recognize about it?" All the prosecutor's questions on this topic are similarly phrased.

[8]Indeed, the most detailed "identification" furnished by Mrs. Lane was her short description of People's exhibit No. 4, a bottle of liqueur, quoted in full by the majority (at fn. 6). Even in that instance, however, the witness was able to point only to the brand or label ("design") of the bottle; she did add that the excise tax seal ("pink liquor seal") would show it was bought in Nevada, but she admitted she did not know whether that bottle had borne such a seal or not. Even if it had, of course, there is no showing that the Lanes were the only residents of this Marin community who bought liquor in Nevada.

Not only is the victims' testimony herein insufficient to provide "specific and articulable facts" as a matter of the record, it is also insufficient as a matter of law. For the facts showing a nexus, a police officer is entitled to rely on such sources as his prior knowledge of the evidence in this or other cases, the information he acquired during the search by use of his senses, and the inferences he reasonably draws therefrom in the light of his training and experience. (See, e.g., *People v. Hill* (1974) *supra*, 12 Cal.3d at p. 763.) These sources are either intrinsically reliable or have been tested and proved so. No such reliability, however, accompanies an on-the-scene claim by the crime victim that an otherwise unidentifiable article was stolen from him. On the contrary, as explained above the victim may be subject to influences that adversely affect his perception, memory or judgment, and result in a greater invasion of the defendant's privacy than necessary.

It is precisely to forestall such risks that the Constitution requires a warrant issued by a magistrate to permit the police to enter a private home: "An intrusion by the state into the privacy of the home for any purpose is one of the most awesome incursions of police power into the life of the individual. Unrestricted authority in this area is anathema to the system of checks envisaged by the Constitution. It is essential that the dispassionate judgment of a magistrate, an official dissociated from the 'competitive enterprise of ferreting out crime' (*Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367]), be interposed between the state and the citizen at this critical juncture." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 275 [127 Cal.Rptr. 629, 545 P.2d 1333].) Here the police substituted the untested opinion of interested private parties for the "dispassionate judgment of a magistrate" in determining the scope of the search and the property to be seized. For the reasons given, the technique is constitutionally intolerable. (*People* v. *Superior Court (Williams)* (1978) 77 Cal.App.3d 69, 78-80 [143 Cal.Rptr. 382].)[9]

It follows that the property seized by Officer Riddell was neither in fact nor in law "reasonably identifiable as contraband" within the meaning of

---

[9]The majority disapprove *Williams* (at fn. 9), but fail to refute its arguments. I would follow this clear California precedent rather than, as do the majority, an opinion of the Arizona court. (*State v. Scigliano* (1978) 120 Ariz. 6 [583 P.2d 893].) In any event, the latter case is clearly distinguishable on its facts. As noted above, in the present matter the police conducted a general exploratory search that was not intended to discover merely the items named in the warrant, and none of those items was in fact found. In *Scigliano*, by contrast, the unlisted articles were discovered "during a limited search which was reasonably calculated to locate items actually named in the warrant, as opposed to a general exploratory search of the premises" (*id.*, at p. 896), and "Many, if not all, of the items specified in the warrants were found." (*Id.*, at p. 894.)

*Skelton.* Accordingly, the majority err in invoking the language of that decision in which we concluded that no purpose other than an "exquisite formalism" would be served by requiring an officer to obtain further authorization before seizing unlisted articles that *were* identifiable as contraband. (*Ante,* p. 76.) On the record of the case at bar the question whether the unlisted articles in defendant's house were contraband and hence could be seized should have been submitted to the judgment of a neutral and detached magistrate. To permit the police to decide that question in their unfettered discretion, as do the majority, is not to avoid an "exquisite formalism" but to fail in a fundamental constitutional duty.

The police practice here in issue, moreover, is not only unlawful, it is also dangerous. In the case at bar the unauthorized persons who accompanied the officer were the victims of the crime; in *Williams* and *Scigliano* it was an erstwhile accomplice turned police informer. It needs little prescience to visualize the potential for explosive confrontations that will arise if these or other interested third parties become routinely involved, whether gratuitously or by police sufferance or invitation, in the process of entering private homes and seizing personal property found inside.[10] The majority nevertheless place their stamp of approval on this procedure, upholding the participation of the victims in Officer Riddell's search on the ground they were "acting essentially in the capacity of police agents" (*ante,* p. 74). We ignore at our peril, I submit, the sad lessons that history teaches as to the high price of vigilante justice: when private citizens are encouraged to act as "police agents," official lawlessness thrives and the liberties of all are put in jeopardy. Surely we should not now repeat the mistakes of a discredited era of our frontier past.[11]

[10]As a matter of fact a violent confrontation occurred at an earlier stage of this very case. Soon after the burglary Mrs. Lane became suspicious that the stolen property might be located in defendant's house; she asked that a search warrant be issued, but the request was refused for lack of evidence. She then told the police that if they could not help her she intended to go to defendant's house herself and look for her property. She admitted on the witness stand that the police specifically warned her "that I didn't have the right to do that, that it would be the wrong thing to do." Despite this warning, Mrs. Lane and her husband went to defendant's house at 10 o'clock that night, opened the garage door, and entered. Mrs. Lane discovered a large bag of garbage near the kitchen entrance to the garage, turned it upside down onto the floor, and rummaged through its contents until she found several items she recognized as hers. As the Lanes were leaving, defendant came out of the house and began cursing them telling them they had no right to enter his garage and threatening that "he was going to get us good." Officer Riddell testified that in an oral statement after his arrest defendant admitted he "confronted" the Lanes in his garage, told them they were trespassing, and "hit the gentleman," i.e., Mr. Lane.

[11]Vigilantes "were, unquestionably, composed in the main of sturdy and conscientious men, indignant at the spectacle of crime unleashed, and honestly trying to find a remedy for a flaw in the social structure; yet their successors, in too many cases, were neither

Finally, perhaps the true motive of the majority appears at the outset of their opinion, where the device here used is repeatedly praised as "efficient" and "highly effective" (*ante,* p. 70). When the inalienable right of privacy (Cal. Const., art. I, § 1) is at stake, however, this court has not heretofore been seduced by the appeal to expediency. In our landmark decision of *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], we firmly rejected the argument that the police should be permitted to ignore the constitutional restrictions on search and seizure simply because it is more "efficient" for them to do so: we explained, "both the United States Constitution and the California Constitution make it emphatically clear that important as efficient law enforcement may be, it is more important that the right of privacy guaranteed by these constitutional provisions be respected. Since in *no* case shall the right of the people to be secure against unreasonable searches and seizures be violated, the contention that unreasonable searches and seizures are justified by the necessity of bringing criminals to justice cannot be accepted. It was rejected when the constitutional provisions were adopted and the choice was made that all the people, guilty and innocent alike, should be secure from unreasonable police intrusions, even though some criminals should escape." (Fn. omitted; *id.* at p. 438.) Quoting Justice Frankfurter, we admonished, " 'it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole.' " (*Id.,* at p. 449.)

As the United States Supreme Court recently reiterated, "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. [Citation.] The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 393 [57 L.Ed.2d 290, 301, 98 S.Ct. 2408].)

The specter of crime victims or criminals turned informers joining the police in ransacking private homes in the name of "efficiency" is a chilling prospect indeed. Not surprisingly, the device has never before

sturdy nor conscientious, were dominated by personal bias or passion, and committed crimes that made the name Vigilante a reproach and a warning." (Coblentz, Villains and Vigilantes (1936) p. 252.)

been sanctioned by this court. Yet because of the inevitable pressures of "the competitive enterprise of ferreting out crime," I fear it will become standard police operating procedure in the future. I cannot join in this erosion of the constitutional rights of all free citizens.

Bird, C. J., and Newman, J., concurred.

---

### APPENDIX

"Q. [by the deputy public defender]. Now, did you at any time take the search warrant with the list of things that are mentioned in here and actually look for those particular items? A. [by Officer Riddell]. Yes, sir.

"Q. And when did you do that? A. It would have been shortly after the search.

"Q. Shortly after the search? A. Subsequent thereto.

"Q. Do you mean by that Mr. or Mrs. Lane came in and pointed out items that were theirs, you confiscated all those items and went through the list and see what items you confiscated on the list? Would that be a fair statement? A. In essence, yes.

"Q. When Mr. and Mrs. Lane came in with you, prior to the time they came in with you, did you make a specific search for each and every one of these items listed on the search warrant? A. No, sir.

" . . . . . . . . . . . .

"Q. All right. And did you and the Lanes go through each and every item in [Glenn Spencer's] room? A. We did.

"Q. Did you take out the search warrant, go through the list and see if any items in the search warrant were there? A. I did not.

"Q. Could you tell me how many items in Glenn Spencer's room you showed to the Lanes? A. Thousands.

"Q. Could you tell me how many items in Jamie Gaumer's room you showed to the Lanes? A. Hundreds.

" . . . . . . . . . . . .

"Q. Now, after you had completed the search of Glenn Spencer's room, where did you and the Lanes go? A. The hall closet between Spencer's room and Gaumer's room.

"Q. All right. And again, was the same procedure followed: all the items in that particular closet were shown to the Lanes? A. That's correct.

"Q. And again you did not go through the list, check off and see if the items were there? A. That's correct.

"Q. How many items did you show the Lanes from the hall closet? A. A number. Probably less than a hundred.

" . . . . . . . . . . . .

"Q. Now, was—when you entered into the room you identified as Mark Meyer's was the same procedure followed again: you take each and every item in the room and show it to the Lanes and see if they could identify it? A. That's correct.

"Q. And again, you did not take the list in the search warrant and look for each of those particular items? A. We did not.

" . . . . . . . . . . . .

"Q. After you went through the room that you identified as Mark Meyer's did you proceed to another area in the house? A. Yes, sir, I did.

"Q. All right. And what area was that? A. This would have been the room opposite Mark Meyers' room.

"Q. All right. And whose room is that? A. Glenn Spencer indicated that it was his room. . . .

"Q. All right. Did you find any particular items in that room? A. Yes, sir.

"Q. All right. And was the same procedure followed with you taking items and showing them to the Lanes and having them identify them? A. That's correct.

"Q. And how many items did you show the Lanes from that room? A. I would say less than 50.

"Q. All right. And how many items of those 50 or so, or less than 50, did the Lanes identify as theirs?

"A. Twenty-one.

"Q. Now, of these 21 items, were any of those items listed in the search warrant? A. Not specifically, no.

"Q. And again, you did not take the search warrant and the items listed therein and go through the rooms to see if any of those items were there? A. That's correct, I did not do that.

"Q. After looking in that particular room, did you go into another area of the house? A. Yes, sir.

"Q. Where was that? A. This was the living room area.

"Q. All right. And again, was the same procedure followed: showing items to the Lanes. A. Yes.

"Q. How many items in the living room were shown to the Lanes? A. Everything that was in the room.

"Q. All right. And again, you did not take the search warrant and go through the list and look for the particular items listed therein? A. That's correct.

"Q. After the living room, where did you go? A. The kitchen area.

"Q. All right. And again, was the same procedure followed: showing items to the Lanes? A. Yes.

"Q. How many items were shown to the Lanes? A. A number.

"Q. Could you give me an estimate of how many? A. In the area of a hundred.

"Q. Would it be fair to state that you showed the Lanes every item that was in the room? A. That's correct.

"Q. How many items did they identify as theirs? A. They identified six items belonging to them.

"Q. All right. And were any of those six items listed in the search warrant itself? A. No, sir.

"Q. All right. And again, you didn't go into the room with the search warrant and look for those particular items that were listed? A. That's correct.

"Q. And after the kitchen, where did you go? A. Family room.

"Q. Again, the same procedure followed: showing the items in that room to the Lanes? A. That's correct.

"Q. And again, you didn't go through the list on the search warrant in the family room looking for particular items listed? A. That's correct.

"Q. And after the family room, where did you go? A. To the garage area.

"Q. And again, the same procedure was followed? A. Yes, sir.

"Q. All right. And how many items did you show the Lanes there? A. Again, a number. I don't know the exact number.

"Q. Did they identify any items belonging to them? A. No, they did not.

"Q. And again, you did not take the search warrant and go through the list and see if the items listed in the search warrant were in the garage? A. That's correct.

"Q. After the garage, where did you go? A. That concluded the search."