[Civ. No. 46821. First Dist., Div. One. Apr. 24, 1980.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
ANDREW MOORE et al., Real Parties in Interest.

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Gloria F. DeHart and Jamie Jacobs-May, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Sheldon Portman, Public Defender, Frank D. Berry, Jr., and Michael A. Kresser, Deputy Public Defenders, and Leonard P. Edwards for Real Parties in Interest.

OPINION

NEWSOM, J.—Petitioner, the People, seeks a writ of mandate pursuant to Penal Code section 1538.5 to compel respondent court to reverse its order granting real parties' motion to suppress evidence.

The underlying cause is a criminal one, in which the real parties are accused of theft of trade secrets, possession of stolen property, conspiracy, offering bribes and solicitation.

The object of the alleged criminal activity was the theft of trade secrets belonging to Intel Corporation, and the affidavit on which the first of two challenged search warrants was issued, recited that real party Moore—an Intel employee—approached one Worth, a purchasing agent for National Semiconductor Corporation (NSC), and offered to sell him such secrets. Worth then informed NSC's president; the police were alerted, and it was arranged that Worth would meet with real parties Moore and Gopal to consummate the sale. Other meetings followed, at which Dunlap, an Intel employee who was present, learned the identity and location of "saleable" items at Gopal's business address and at his home.

On the basis of this information, a search warrant was issued authorizing seizure of a number of items, to wit:

"1.  Magnetic data base tape containing Intel Mask data or facsimile for product No. 2147 4K static Ram.

"2.  Magnetic data base tape for product No. 2114 1K static Ram.

"3.  Magnetic data base tape for product No. 2716 16K EPROM.

"4.  Magnetic data base tape for product No. 8080A central processing unit.

"5.  Magnetic data base tape for product No. 2332 32K ROM.

"6.  Magnetic data base tape for product No. 8085 central processing unit.

"7.  Proprietary documents or facsimile detailing process flow for each and every one of the above products numbered 1 through 6.

"8. Run cards for each and every one of the above products numbered 1 through 6.

"9. Transparent overlays for each and every one of the above products numbered 1 through 6.

"10. Reticles consisting of glass plates for Masks for each and every one of the products numbered 1 through 6 above.

"11. Composite or single layer Mylar plots for each and every one of the products numbered 1 through 6 above."

An elementary explanation of the manufacturing process of semiconductors was introduced at the suppression hearing, and may be summarized as follows.

The first step involved in the process is creating a "composite drawing," i.e., a handrawn depiction of all layers of the product, resembling a schematic for a radio. This design is then "digitized": a computer traces every line along an X-Y cursor, and stores the information. This is called a data base tape.

Intel then sends the pattern generator tape to a mask vendor, who puts it into a machine which, by use of a camera develops a reticle. The reticle is 10 times larger than the actual chip size and contains the information for just one of the 6 to 10 layers which comprise a chip.

Next, the reticle is blown up 200 times—the resulting enlarged reproduction being called a "blow back" or "overlay." Once the reticle is confirmed as containing the correct design, it is placed in a repeat camera which reduces the design to actual size and repeats it over and over again on a chrome piece or "mask" which then becomes the actual production tool.

In the affidavit on which the warrant was initially based, the affiant-police officer, averring that he could not identify the property due to its technical nature without expert assistance, requested and received authorization for such assistance—although the warrant does not so recite. The assistance of experts, we note, is authorized under Penal Code section 1530.

During execution of the warrant, none of the officers present actually did any searching, since none of them knew what the items described in the warrant looked like. Rather, at the direction of the officer in charge, they stood and watched while the experts searched. The latter would inform the officers when they found an item they believed to be one described in the warrant, without, however, communicating the factual basis for such belief.

In addition to the items named in the warrant, Dunlap, who was among the searchers, discovered other items he believed to be stolen and was directed by the officers to put such items aside, so that a second affidavit might be drawn authorizing their seizure. This was done, later in the same day, and a second affidavit, incorporating the first, described the "new" items and recited that Dunlap had informed the affiant that he recognized such items as stolen property. The warrant was issued and executed, resulting in seizure of a number of additional items.

I

*Evidence Seized Under the First Warrant*

The court suppressed evidence seized pursuant to the first warrant because the experts "aiding" the officers executing the warrant (Pen. Code, § 1530) failed to communicate to the latter the *factual* basis upon which their identification was made; or, in other words, they gave the police their conclusion, without imparting the rational process by which they arrived at it. This, the trial court, after careful consideration, found insufficient, consequently issuing its suppression order.

The decision preceded a very recent holding by our Supreme Court on the same subject. In *People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67 [157 Cal.Rptr. 716, 598 P.2d 877], the court held police officers could legitimately seize items not enumerated in a search warrant, but identified by the burglary victim during the course of a police search. As the court said: "...by pointing out to Officer Riddell items of their stolen property, Mr. and Mrs. Lane provided the requisite 'rational link' between the articles confiscated and possible criminal behavior by defendant." (*Id.*, at pp. 74-75.)

Here, as in *Meyers, supra,* it could be said that but for the presence and knowledge of the nonpolice personnel, the officers could not have

known the property in question was stolen. Appellant argues, however, that while in *Meyers*, the "specific articulable facts" providing a reasonable basis for the inference of theft were spelled out, in the case at bar mere conclusions, unsupported by facts, were conveyed.

We are unable to perceive any meaningful distinction in the difference just recited. In *People* v. *Superior Court (Meyers), supra*, 25 Cal. 3d 67, the victim was, for example, able to "identify" a bottle of liquor found in defendant's room "because of the design on it." "Whether this bottle had a pink liquor seal or not, I don't know," she stated; and, again, "We do buy all our liquor in Nevada. This seal would probably prove it was purchased in Nevada." (*Id.*, p. 75, fn. 6.) If anything, such testimony seems to provide a more conjectural and hence less reasonable basis for a belief in the stolen character of the goods than the conclusion of an expert witness such as Dunlap. And, as the People contend, "articulation" of the factual basis for the opinion Dunlap harbored would have been an empty gesture, since the police officers were incapable of exercising independent judgment in assessing the logical scientific connection between such facts and the conclusions to which they led.

■ We are of the opinion that the *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509] requirement of articulation of a factual basis for an informer's conclusions in an affidavit for a search warrant is not equally applicable to *identification* of items such as those specified in the subject warrant, which are not susceptible of recognition by lay persons even when factually described by accompanying expert witnesses.

The rationale of the *Aguilar* requirement is to insure that the *magistrate* and not the police, makes the essential determination of probable cause, and makes it whenever possible on a factual rather than conclusionary basis. Here, the magistrate had already made a determination of probable cause, and the officers were not vested with any discretion as to which items could be seized, any more than were the experts: all were under a duty—absent other legal justification—to seize only those items described in the warrant, (*Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590]).

The problem, then, hinged on ascertainment of *which* items were those described in the warrant. Admittedly, when there is a method

available for identification of the specific items sought, generic description and seizure are impermissible. (*United States* v. *Klein* (1st Cir. 1977) 565 F.2d 183, 188; cf. Model Code of Pre-Arraignment Procedure, § 220.5 (Proposed Official Draft 1975), suggesting generic seizure, impoundment and court supervised search.) But patently no such method was available here. The presence, and participation, of the officer in executing the warrant cannot sensibly be understood to require knowledge which a police officer could not reasonably be expected to possess. Consequently, we think there is no requirement that such experts, prior to stating their conclusions, engage in the futile task of attempting to educate accompanying police officers in the rudiments of computer science, or art forgery, or any other subject of scientific or artistic expertise.*

## II

*The Second "Search and Seizure"*

During the search, the experts encountered items, which while not listed in the warrant, they believed—on the basis of experience and expertise—to be stolen. These items they were instructed by the police to set aside. Nothing was told the officers respecting the factual basis for the belief that the items were stolen, except by Dunlap, who stated that nine reticles undescribed in the warrant displayed Intel's logo, and thus were probably stolen. As in the case of the earlier seized items, the officers executing the warrant accepted the experts' conclusions without exercising any independent judgment regarding the underlying factual basis.

■ Petitioner argues that the subsequent seizure of the items set aside was permissible under the "plain sight" rule, defined in *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485], as follows: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' effort."

---

*The argument that the police procedure here lacked accountability is meritless, since postseizure review would insure that the items seized were those described in the warrant. (Pen. Code, § 1538.5, subd. (a)(2)(ii).)

In *People* v. *Superior Court* (*Meyers*), *supra*, 25 Cal.3d 67, our high court commented as follows: "*Skelton* reflects our earlier, pragmatic recognition in *People* v. *Roberts* (1956) 374, 379...that '...in the course of conducting a reasonable search [police officers] d[o] not have to blind themselves to what [i]s in plain sight simply because it [i]s disconnected with the purpose for which they entered.' (See *Skelton* v. *Superior Court, supra*, 1 Cal.3d at pp. 157-158.) Thus in *Skelton* we upheld the right of officers legally on the premises to seize articles which were 'reasonably identifiable as contraband' on the rationale that it represented 'a realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion.' (*Id.*, at p. 58.) [¶] In recognizing a 'plain sight' exception to the general warrant requirement we did not, however, intend to violate the fundamental proposition that the scope of a search must be circumscribed by the reasons which justified its inception. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 18. . . .) Thus in *People* v. *Hill* (1974) 12 Cal.3d 731..., we fashioned a 'nexus rule' to prohibit police officers, in the course of a lawful search, from indiscriminately seizing any items whatsoever. 'The police officers who seize an article must be presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred....[P]ure speculation...will not suffice to establish the requisite nexus.' (*Id.*, at p. 763.)" (*Id.*, at pp. 73-74.)

The link which, the People argue, supplies a rational basis for the second seizure, may be found in the totality of the following circumstances. The experts were employees in a victim corporation; they had just furnished information justifying issuance of the first search warrant; they possessed expertise in identifying the second set of items; they informed the officers of their belief that the items were stolen; and the items seized were on the premises of a person then known to have probably possessed stolen property.

Real parties respond, in essence, that *People* v. *Superior Court* (*Meyers, supra*, 25 Cal.3d 67, requires something more than this, as evidenced by the majority's reliance on the victim's articulation in that case of the reasons why she believed certain "plain view" items to be hers. Here, it is argued, except for the Intel logo on the nine reticles, such "articulation" was absent, and the seizure, which, from the officers' viewpoint, was based upon mere judgmental submission, is hence invalid. We believe that the findings enumerated above supplied a sufficient basis for the nexus required by *Hill* and *Meyers*. (*Anglin* v.

*Director, Patuxent Institution* (4th Cir. 1971) 439 F.2d 1342, 1348; *State v. Scigliano* (1978) 120 Ariz. 6 [583 P.2d 893, 896].)

██   Hence, we believe that the second warrant authorizing seizure of the additional items was valid. The affidavit for the second warrant incorporated the affidavit supporting the first. It listed by type and owner each described item, and stated that Dunlap, on the basis of experience and expertise, believed such items to be stolen.

Real parties argue that the facts thus furnished are conclusionary and fail to meet the first prong of the *Aguilar* test which requires that the magistrate be informed of some of the underlying factual circumstances on which the affiant's conclusions are based. (*Aguilar v. Texas, supra*, 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729].)

It is true that in the affidavit Dunlap did not say *how* he knew the items belonged to other semiconductor companies, or *why* he believed them to be stolen. Yet the underlying factual information from which the magistrate could reasonably conclude that informant was credible is, under all of the circumstances, implicit in the recital of the affiant's conclusion. (*Spinelli v. United States* (1969) 393 U.S. 410, 413 [21 L.Ed.2d 637, 641-642, 89 S.Ct. 584]; *Price v. Superior Court* (1970) 1 Cal.3d 836, 840 [83 Cal.Rptr. 369, 463 P.2d 721]; *People v. Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]. Cf. 1 LaFave, Search and Seizure (1978) § 3.3, fn. 163, p. 539; *People v. Furman* (1973) 30 Cal.App.3d 454 [106 Cal.Rptr. 366].)

The "factual basis" requirement of *Aguilar v. Texas, supra*, 378 U.S. 108 is in our view a flexible one. Our courts have, in effect, pragmatically accepted the "expertise" of a dog whose sense of smell led to the detection of marijuana (*People v. Furman, supra*, 30 Cal.App.3d 454), and commonly informers in narcotics cases have not been required to articulate the basis upon which their belief in the narcotic nature of contraband is grounded. (See LaFave, *op. cit. supra*, § 3.3, fn. 163, p. 539.)

Accepting the probability of truth in the conclusions of trained experts in the computer field respecting the likelihood that reticles bearing the logo of other companies—in the otherwise inexplicable possession of a rival company's employee—were stolen property, seems much less tenuous than the examples just cited. This seems all the more so on the narrow facts of the case at bar, where Dunlap had, just prior

to seeing the subject property, assisted in executing a warrant describing a number of items plausibly believed by the magistrate to be in the illegal possession of the same person.

While *Aguilar* v. *Texas, supra*, 378 U.S. 108 is the law of the land, its "prongs" ought not to be bent in opposition to pragmatic realities and common sense. (*United States* v. *Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 688-689, 85 S.Ct. 741].)

Let a peremptory writ of mandate issue, compelling respondent court to reverse its order suppressing evidence.

Elkington, Acting P. J., concurred.

GRODIN, J.—I concur in part I of the majority opinion for the reasons stated therein. I concur in the result with regard to part II on the ground that while it would have been better practice to include in the affidavit a more particularized statement as to the basis for Dunlap's belief that certain items belonged to semiconductor companies other than Intel and that they had been stolen, the affidavit contains sufficient indicia of reliability and credibility to support the second warrant. I would not sustain the seizure of these items on the alternative basis of the "plain view" exception to the warrant requirement, except as to the nine reticles which contained the Intel logo, and which Dunlap so identified to the officers.

The petition of real parties in interest for a hearing by the Supreme Court was denied June 18, 1980. Mosk, J., was of the opinion that the petition should be granted.